# PLANNED PARENTHOOD OF CENTRAL MISSOURI ET AL. v. DANFORTH, ATTORNEY GENERAL OF MISSOURI, ET AL.

No. 74–1151.   Argued March 23, 1976—Decided July 1, 1976*

*Together with No. 74–1419, *Danforth, Attorney General of Missouri* v. *Planned Parenthood of Central Missouri et al.,* also on appeal from the same court.

54

*Frank Susman* argued the cause for appellants in No. 74–1151 and for appellees in No. 74–1419. With him on the brief was *Judith Mears*.

*John C. Danforth, pro se,* Attorney General of Missouri, argued the cause for appellees in No. 74–1151 and for appellant in No. 74–1419. With him on the brief were *D. Brook Bartlett,* First Assistant Attorney General, and *Karen M. Iverson* and *Christopher R. Brewster,* Assistant Attorneys General.†

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case is a logical and anticipated corollary to *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), for it raises issues secondary to those that were then before the Court. Indeed, some of the questions now presented were forecast and reserved in *Roe* and *Doe.* 410 U. S., at 165 n. 67.

I

After the decisions in *Roe* and *Doe,* this Court remanded for reconsideration a pending Missouri federal case in which the State's then-existing abortion legisla-

---

†*Rhonda Copelon* and *Nancy Stearns* filed a brief in both cases for the Center for Constitutional Rights et al. as *amici curiae* urging reversal in No. 74–1151.

Briefs of *amici curiae* were filed in both cases by *Eugene Krasicky, George E. Reed,* and *Patrick F. Geary* for the United States Catholic Conference; and by *Harriet F. Pilpel* for Planned Parenthood Federation of America, Inc., et al. Briefs of *amici curiae* were filed in No. 74–1151 by *John J. Donnelly* for Lawyers for Life, Inc., et al., and by *Jerome M. McLaughlin* for Missouri Nurses for Life.

tion, Mo. Rev. Stat. §§ 559.100, 542.380, and 563.300 (1969), was under constitutional challenge. *Rodgers* v. *Danforth*, 410 U. S. 949 (1973). A three-judge federal court for the Western District of Missouri, in an unreported decision, thereafter declared the challenged Missouri statutes unconstitutional and granted injunctive relief. On appeal here, that judgment was summarily affirmed. *Danforth* v. *Rodgers*, 414 U. S. 1035 (1973).

In June 1974, somewhat more than a year after *Roe* and *Doe* had been decided, Missouri's 77th General Assembly, in its Second Regular Session, enacted House Committee Substitute for House Bill No. 1211 (hereinafter Act). The legislation was approved by the Governor on June 14, 1974, and became effective immediately by reason of an emergency clause contained in § A of the statute. The Act is set forth in full as the Appendix to this opinion. It imposes a structure for the control and regulation of abortions in Missouri during all stages of pregnancy.

## II

Three days after the Act became effective, the present litigation was instituted in the United States District Court for the Eastern District of Missouri. The plaintiffs are Planned Parenthood of Central Missouri, a not-for-profit Missouri corporation which maintains a facility in Columbia, Mo., for the performance of abortions; David Hall, M. D.; and Michael Freiman, M. D. Doctor Hall is a resident of Columbia, is licensed as a physician in Missouri, is chairman of the Department and Professor of Obstetrics and Gynecology at the University of Missouri Medical School at Columbia, and supervises abortions at the Planned Parenthood facility. He was described by the three-judge court in the 1973 case as one of four plaintiffs who were "eminent, Missouri-licensed obstetricians and gynecologists." Jurisdictional

Statement, App. A7, in *Danforth* v. *Rodgers,* No. 73–426, O. T. 1973. Doctor Freiman is a resident of St. Louis, is licensed as a physician in Missouri, is an instructor of Clinical Obstetrics and Gynecology at Washington University Medical School, and performs abortions at two St. Louis hospitals and at a clinic in that city.

The named defendants are the Attorney General of Missouri and the Circuit Attorney of the city of St. Louis "in his representative capacity" and "as the representative of the class of all similar Prosecuting Attorneys of the various counties of the State of Missouri." Complaint 10.

The plaintiffs brought the action on their own behalf and, purportedly, "on behalf of the entire class consisting of duly licensed physicians and surgeons presently performing or desiring to perform the termination of pregnancies and on behalf of the entire class consisting of their patients desiring the termination of pregnancy, all within the State of Missouri." *Id.,* at 9. Plaintiffs sought declaratory relief and also sought to enjoin enforcement of the Act on the ground, among others, that certain of its provisions deprived them and their patients of various constitutional rights: "the right to privacy in the physician-patient relationship"; the physicians' "right to practice medicine according to the highest standards of medical practice"; the female patients' right to determine whether to bear children; the patients' "right to life due to the inherent risk involved in childbirth" or in medical procedures alternative to abortion; the physicians' "right to give and plaintiffs' patients' right to receive safe and adequate medical advice and treatment, pertaining to the decision of whether to carry a given pregnancy to term and the method of termination"; the patients' right under the Eighth Amendment to be free from cruel and unusual punishment "by forcing

and coercing them to bear each pregnancy they conceive"; and, by being placed "in the position of decision making beset with . . . inherent possibilities of bias and conflict of interest," the physician's right to due process of law guaranteed by the Fourteenth Amendment. *Id.,* at 10–11.

The particular provisions of the Act that remained under specific challenge at the end of trial were § 2 (2), defining the term "viability"; § 3 (2), requiring from the woman, prior to submitting to abortion during the first 12 weeks of pregnancy, a certification in writing that she consents to the procedure and "that her consent is informed and freely given and is not the result of coercion"; § 3 (3), requiring, for the same period, "the written consent of the woman's spouse, unless the abortion is certified by a licensed physician to be necessary in order to preserve the life of the mother"; § 3 (4), requiring, for the same period, "the written consent of one parent or person in loco parentis of the woman if the woman is unmarried and under the age of eighteen years, unless the abortion is certified by a licensed physician as necessary in order to preserve the life of the mother"; § 6 (1), requiring the physician to exercise professional care "to preserve the life and health of the fetus" and, failing such, deeming him guilty of manslaughter and making him liable in an action for damages; § 7, declaring an infant, who survives "an attempted abortion which was not performed to save the life or health of the mother," to be "an abandoned ward of the state under the jurisdiction of the juvenile court," and depriving the mother, and also the father if he consented to the abortion, of parental rights; § 9, the legislative finding that the method of abortion known as saline amniocentesis "is deleterious to maternal health," and prohibiting that method after the first 12 weeks of pregnancy; and §§ 10

and 11, imposing reporting and maintenance of record requirements for health facilities and for physicians who perform abortions.

The case was presented to a three-judge District Court convened pursuant to the provisions of 28 U. S. C. §§ 2281 and 2284. 392 F. Supp. 1362 (1975). The court ruled that the two physician-plaintiffs had standing inasmuch as § 6 (1) provides that the physician who fails to exercise the prescribed standard of professional care due the fetus in the abortion procedure shall be guilty of manslaughter, and § 14 provides that any person who performs or aids in the performance of an abortion contrary to the provisions of the Act shall be guilty of a misdemeanor. 392 F. Supp., at 1366–1367. Due to this "obvious standing" of the two physicians, *id.*, at 1367, the court deemed it unnecessary to determine whether Planned Parenthood also had standing.

On the issues as to the constitutionality of the several challenged sections of the Act, the District Court, largely by a divided vote, ruled that all except the first sentence of § 6 (1) withstood the attack. That sentence was held to be constitutionally impermissible because it imposed upon the physician the duty to exercise at all stages of pregnancy "that degree of professional skill, care and diligence to preserve the life and health of the fetus" that "would be required . . . to preserve the life and health of any fetus intended to be born." Inasmuch as this failed to exclude the stage of pregnancy prior to viability, the provision was "unconstitutionally overbroad." 392 F. Supp., at 1371.

One judge concurred in part and dissented in part. *Id.*, at 1374. He agreed with the majority as to the constitutionality of §§ 2 (2), 3 (2), 10, and 11, respectively relating to the definition of "viability," the woman's prior written consent, maintenance of records,

and retention of records. He also agreed with the majority that § 6 (1) was unconstitutionally overbroad. He dissented from the majority opinion upholding the constitutionality of §§ 3 (3), 3 (4), 7, and 9, relating, respectively, to spousal consent, parental consent, the termination of parental rights, and the proscription of saline amniocentesis.

In No. 74–1151, the plaintiffs appeal from that part of the District Court's judgment upholding sections of the Act as constitutional and denying injunctive relief against their application and enforcement. In No. 74–1419, the defendant Attorney General cross-appeals from that part of the judgment holding § 6 (1) unconstitutional and enjoining enforcement thereof. We granted the plaintiffs' application for stay of enforcement of the Act pending appeal. 420 U. S. 918 (1975). Probable jurisdiction of both appeals thereafter was noted. 423 U. S. 819 (1975).

For convenience, we shall usually refer to the plaintiffs as "appellants" and to both named defendants as "appellees."

### III

In *Roe* v. *Wade* the Court concluded that the "right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U. S., at 153. It emphatically rejected, however, the proffered argument "that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses." *Ibid.* Instead,

this right "must be considered against important state interests in regulation." *Id.*, at 154.

The Court went on to say that the "pregnant woman cannot be isolated in her privacy," for she "carries an embryo and, later, a fetus." *Id.*, at 159. It was therefore "reasonable and appropriate for a State to decide that at some point in time another interest, that of health of the mother or that of potential human life, becomes significantly involved. The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly." *Ibid.* The Court stressed the measure of the State's interest in "the light of present medical knowledge." *Id.*, at 163. It concluded that the permissibility of state regulation was to be viewed in three stages: "For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician," without interference from the State. *Id.*, at 164. The participation by the attending physician in the abortion decision, and his responsibility in that decision, thus, were emphasized. After the first stage, as so described, the State may, if it chooses, reasonably regulate the abortion procedure to preserve and protect maternal health. *Ibid.* Finally, for the stage subsequent to viability, a point purposefully left flexible for professional determination, and dependent upon developing medical skill and technical ability,[1] the State may regulate an abortion to protect the life of the fetus and even may proscribe abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *Id.*, at 163–165.

---

[1] "Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Roe* v. *Wade*, 410 U. S., at 160.

## IV

With the exception specified in n. 2, *infra,* we agree with the District Court that the physician-appellants clearly have standing. This was established in *Doe* v. *Bolton,* 410 U. S., at 188. Like the Georgia statutes challenged in that case, "[t]he physician is the one against whom [the Missouri Act] directly operate[s] in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."[2]   *Ibid.*

Our primary task, then, is to consider each of the

---

[2] This is not so, however, with respect to § 7 of the Act pertaining to state wardship of a live-born infant. Section 7 applies "where a live born infant results from an attempted abortion which was not performed to save the life or health of the mother." It then provides that the infant "shall be an abandoned ward of the state" and that the mother—and the father, too, if he consented to the abortion—"shall have no parental rights or obligations whatsoever relating to such infant."

The physician-appellants do not contend that this section of the Act imposes any obligation on them or that its operation otherwise injures them in fact. They do not claim any interest in the question of who receives custody that is "sufficiently concrete" to satisfy the "case or controversy" requirement of a federal court's Art. III jurisdiction. *Singleton* v. *Wulff, post,* at 112. Accordingly, the physician-appellants do not have standing to challenge § 7 of the Act.

The District Court did not decide whether Planned Parenthood has standing to challenge the Act, or any portion of it, because of its view that the physician-appellants have standing to challenge the entire Act.   392 F. Supp. 1362, 1366–1367 (1975).   We decline to consider here the standing of Planned Parenthood to attack § 7. That question appropriately may be left to the District Court for reconsideration on remand. As a consequence, we do not decide the issue of § 7's constitutionality.

challenged provisions of the new Missouri abortion statute in the particular light of the opinions and decisions in *Roe* and in *Doe*. To this we now turn, with the assistance of helpful briefs from both sides and from some of the *amici*.

A

*The definition of viability.* Section 2 (2) of the Act defines "viability" as "that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems." Appellants claim that this definition violates and conflicts with the discussion of viability in our opinion in *Roe.* 410 U. S., at 160, 163. In particular, appellants object to the failure of the definition to contain any reference to a gestational time period, to its failure to incorporate and reflect the three stages of pregnancy, to the presence of the word "indefinitely," and to the extra burden of regulation imposed. It is suggested that the definition expands the Court's definition of viability, as expressed in *Roe,* and amounts to a legislative determination of what is properly a matter for medical judgment. It is said that the "mere possibility of momentary survival is not the medical standard of viability." Brief for Appellants 67.

In *Roe,* we used the term "viable," properly we thought, to signify the point at which the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid," and presumably capable of "meaningful life outside the mother's womb," 410 U. S., at 160, 163. We noted that this point "is usually placed" at about seven months or 28 weeks, but may occur earlier. *Id.,* at 160.

We agree with the District Court and conclude that the definition of viability in the Act does not conflict with what was said and held in *Roe.* In fact, we believe that

§ 2 (2), even when read in conjunction with § 5 (proscribing an abortion "not necessary to preserve the life or health of the mother . . . unless the attending physician first certifies with reasonable medical certainty that the fetus is not viable"), the constitutionality of which is not explicitly challenged here, reflects an attempt on the part of the Missouri General Assembly to comply with our observations and discussion in *Roe* relating to viability. Appellant Hall, in his deposition, had no particular difficulty with the statutory definition.[3]  As noted above, we recognized in *Roe* that viability was a matter of medical judgment, skill, and technical ability, and we preserved the flexibility of the term.  Section 2 (2) does the same.  Indeed, one might argue, as the appellees do, that the presence of the statute's words "continued indefinitely" favor, rather than disfavor, the appellants, for, arguably, the point when life can be "continued indefinitely outside the womb" may well occur later in pregnancy than the point where the fetus is "potentially able to live outside the mother's womb." *Roe* v. *Wade,* 410 U. S., at 160.

In any event, we agree with the District Court that it is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period.  The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.  The definition of viability in § 2 (2) merely reflects this fact. The appellees do not contend otherwise, for they insist

---

[3] "[A]lthough I agree with the definition of 'viability,' I think that it must be understood that viability is a very difficult state to assess." Tr. 369.

that the determination of viability rests with the physician in the exercise of his professional judgment.[4]

We thus do not accept appellants' contention that a specified number of weeks in pregnancy must be fixed by statute as the point of viability. See *Wolfe* v. *Schroering,* 388 F. Supp. 631, 637 (WD Ky. 1974); *Hodgson* v. *Anderson,* 378 F. Supp. 1008, 1016 (Minn. 1974), dismissed for want of jurisdiction *sub nom. Spannaus* v. *Hodgson,* 420 U. S. 903 (1975).[5]

We conclude that the definition in § 2 (2) of the Act does not circumvent the limitations on state regulation outlined in *Roe.* We therefore hold that the Act's definition of "viability" comports with *Roe* and withstands the constitutional attack made upon it in this litigation.

## B

*The woman's consent.* Under § 3 (2) of the Act, a woman, prior to submitting to an abortion during the first 12 weeks of pregnancy, must certify in writing her consent to the procedure and "that her consent is informed and freely given and is not the result of coercion." Appellants argue that this requirement is violative of

---

[4] "The determination of when the fetus is viable rests, as it should, with the physician, in the exercise of his medical judgment, on a case-by-case basis." Brief for Appellee Danforth 26. "Because viability may vary from patient to patient and with advancements in medical technology, it is essential that physicians make the determination in the exercise of their medical judgment." *Id.,* at 28. "Defendant agrees that 'viability' will vary, that it is a difficult state to assess . . . and that it must be left to the physician's judgment." *Id.,* at 29.

[5] The Minnesota statute under attack in *Hodgson* provided that a fetus "shall be considered potentially 'viable' " during the second half of its gestation period. Noting that the defendants had presented no evidence of viability at 20 weeks, the three-judge District Court held that that definition of viability was "unreasonable and cannot stand." 378 F. Supp., at 1016.

*Roe* v. *Wade,* 410 U. S., at 164–165, by imposing an extra layer and burden of regulation on the abortion decision. See *Doe* v. *Bolton,* 410 U. S., at 195–200. Appellants also claim that the provision is overbroad and vague.

The District Court's majority relied on the propositions that the decision to terminate a pregnancy, of course, "is often a stressful one," and that the consent requirement of § 3 (2) "insures that the pregnant woman retains control over the discretions of her consulting physician." 392 F. Supp., at 1368, 1369. The majority also felt that the consent requirement "does not single out the abortion procedure, but merely includes it within the category of medical operations for which consent is required." [6] *Id.,* at 1369. The third judge joined the majority in upholding § 3 (2), but added that the written consent requirement was "not burdensome or chilling" and manifested "a legitimate interest of the state that this important decision has in fact been made by the person constitutionally empowered to do so." 392 F. Supp., at 1374. He went on to observe that the requirement "in no way interposes the state or third parties in the decision-making process." *Id.,* at 1375.

We do not disagree with the result reached by the District Court as to § 3 (2). It is true that *Doe* and *Roe* clearly establish that the State may not restrict the decision of the patient and her physician regarding abortion during the first stage of pregnancy. Despite the fact that apparently no other Missouri statute, with the exceptions referred to in n. 6, *supra,* requires a

---

[6] Apparently, however, the only other Missouri statutes concerned with consent for general medical or surgical care relate to persons committed to the Missouri State chest hospital, Mo. Rev. Stat. § 199.240 (Supp. 1975), or to mental or correctional institutions, § 105.700 (1969).

patient's prior written consent to a surgical procedure,[7] the imposition by § 3 (2) of such a requirement for termination of pregnancy even during the first stage, in our view, is not in itself an unconstitutional requirement. The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.

We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional. As a consequence, we see no constitutional defect in requiring it only for some types of surgery as, for example, an intracardiac procedure, or where the surgical risk is elevated above a specified mortality level, or, for that matter, for abortions.[8]

## C

*The spouse's consent.* Section 3 (3) requires the prior written consent of the spouse of the woman seeking an abortion during the first 12 weeks of pregnancy, unless

[7] There is some testimony in the record to the effect that taking from the patient a prior written consent to surgery is the custom. That may be so in some areas of Missouri, but we definitely refrain from characterizing it extremely as "the universal practice of the medical profession," as the appellees do. Brief for Appellee Danforth 32.

[8] The appellants' vagueness argument centers on the word "informed." One might well wonder, offhand, just what "informed consent" of a patient is. The three Missouri federal judges who composed the three-judge District Court, however, were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

"the abortion is certified by a licensed physician to be necessary in order to preserve the life of the mother." [9]

The appellees defend § 3 (3) on the ground that it was enacted in the light of the General Assembly's "perception of marriage as an institution," Brief for Appellee Danforth 34, and that any major change in family status is a decision to be made jointly by the marriage partners. Reference is made to an abortion's possible effect on the woman's childbearing potential. It is said that marriage always has entailed some legislatively imposed limitations: Reference is made to adultery and bigamy as criminal offenses; to Missouri's general requirement, Mo. Rev. Stat. § 453.030.3 (1969), that for an adoption of a child born in wedlock the consent of both parents is necessary; to similar joint-consent requirements imposed by a number of States with respect to artificial insemination and the legitimacy of children so conceived; to the laws of two States requiring spousal consent for voluntary sterilization; and to the long-established requirement of spousal consent for the effective disposition of an interest in real property. It is argued that "[r]ecognizing that the consent of both parties is generally necessary . . . to begin a family, the legislature has determined that a change in the family structure set in motion by mutual consent should be terminated only by mutual consent," Brief for Appellee Danforth 38, and that what the legislature did was to exercise its inherent policy-making power "for what was believed to be in the best interests of all the people of Missouri." Id., at 40.

The appellants, on the other hand, contend that § 3 (3) obviously is designed to afford the husband the right unilaterally to prevent or veto an abortion, whether or

---

[9] It is of some interest to note that the condition does not relate, as most statutory conditions in this area do, to the preservation of the life or *health* of the mother.

not he is the father of the fetus, and that this not only violates *Roe* and *Doe* but is also in conflict with other decided cases. See, *e. g., Poe* v. *Gerstein,* 517 F. 2d 787, 794–796 (CA5 1975), appeal docketed, No. 75–713; *Wolfe* v. *Schroering,* 388 F. Supp., at 636–637; *Doe* v. *Rampton,* 366 F. Supp. 189, 193 (Utah 1973). They also refer to the situation where the husband's consent cannot be obtained because he cannot be located. And they assert that § 3 (3) is vague and overbroad.

In *Roe* and *Doe* we specifically reserved decision on the question whether a requirement for consent by the father of the fetus, by the spouse, or by the parents, or a parent, of an unmarried minor, may be constitutionally imposed. 410 U. S., at 165 n. 67. We now hold that the State may not constitutionally require the consent of the spouse, as is specified under § 3 (3) of the Missouri Act, as a condition for abortion during the first 12 weeks of pregnancy. We thus agree with the dissenting judge in the present case, and with the courts whose decisions are cited above, that the State cannot "delegate to a spouse a veto power which the state itself is absolutely and totally prohibited from exercising during the first trimester of pregnancy." 392 F. Supp., at 1375. Clearly, since the State cannot regulate or proscribe abortion during the first stage, when the physician and his patient make that decision, the State cannot delegate authority to any particular person, even the spouse, to prevent abortion during that same period.

We are not unaware of the deep and proper concern and interest that a devoted and protective husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying. Neither has this Court failed to appreciate the importance of the marital relationship in our society. See, *e. g., Griswold* v. *Connecticut,* 381 U. S. 479, 486 (1965); *Maynard* v. *Hill,* 125 U. S.

190, 211 (1888).[10]  Moreover, we recognize that the decision whether to undergo or to forgo an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious.  Notwithstanding these factors, we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right.  See *Eisenstadt* v. *Baird*, 405 U. S. 438, 453 (1972).[11]

---

[10] "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system.  Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions."  *Griswold* v. *Connecticut*, 381 U. S., at 486.

[11] As the Court recognized in *Eisenstadt* v. *Baird*, "the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup.  If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."  405 U. S., at 453 (emphasis in original).

The dissenting opinion of our Brother WHITE appears to overlook the implications of this statement upon the issue whether § 3 (3) is constitutional.  This section does much more than insure that the husband participate in the decision whether his wife should have an abortion.  The State, instead, has determined that the husband's interest in continuing the pregnancy of his wife always outweighs any interest on her part in terminating it irrespective of the condition of their marriage.  The State, accordingly, has granted him the right to prevent unilaterally, and for whatever reason, the effectuation of his wife's and her physician's decision to terminate her pregnancy.  This state determination not only may discourage the consultation that might normally be expected to precede a major decision affecting the marital couple but also, and more importantly,

It seems manifest that, ideally, the decision to terminate a pregnancy should be one concurred in by both the wife and her husband. No marriage may be viewed as harmonious or successful if the marriage partners are fundamentally divided on so important and vital an issue. But it is difficult to believe that the goal of fostering mutuality and trust in a marriage, and of strengthening the marital relationship and the marriage institution, will be achieved by giving the husband a veto power exercisable for any reason whatsoever or for no reason at all. Even if the State had the ability to delegate to the husband a power it itself could not exercise, it is not at all likely that such action would further, as the District Court majority phrased it, the "interest of the state in protecting the mutuality of decisions vital to the marriage relationship." 392 F. Supp., at 1370.

We recognize, of course, that when a woman, with the approval of her physician but without the approval of her husband, decides to terminate her pregnancy, it could be said that she is acting unilaterally. The obvious fact is that when the wife and the husband disagree on this decision, the view of only one of the two marriage partners can prevail. Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor. Cf. *Roe* v. *Wade*, 410 U. S., at 153.

We conclude that § 3 (3) of the Missouri Act is inconsistent with the standards enunciated in *Roe* v. *Wade*, 410 U. S., at 164–165, and is unconstitutional. It is therefore unnecessary for us to consider the appellants'

---

the State has interposed an absolute obstacle to a woman's decision that *Roe* held to be constitutionally protected from such interference.

additional challenges to § 3 (3) based on vagueness and overbreadth.

## D

*Parental Consent.* Section 3 (4) requires, with respect to the first 12 weeks of pregnancy, where the woman is unmarried and under the age of 18 years, the written consent of a parent or person *in loco parentis* unless, again, "the abortion is certified by a licensed physician as necessary in order to preserve the life of the mother." It is to be observed that only one parent need consent.

The appellees defend the statute in several ways. They point out that the law properly may subject minors to more stringent limitations than are permissible with respect to adults, and they cite, among other cases, *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), and *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971). Missouri law, it is said, "is replete with provisions reflecting the interest of the state in assuring the welfare of minors," citing statutes relating to a guardian *ad litem* for a court proceeding, to the care of delinquent and neglected children, to child labor, and to compulsory education. Brief for Appellee Danforth 42. Certain decisions are considered by the State to be outside the scope of a minor's ability to act in his own best interest or in the interest of the public, citing statutes proscribing the sale of firearms and deadly weapons to minors without parental consent, and other statutes relating to minors' exposure to certain types of literature, the purchase by pawnbrokers of property from minors, and the sale of cigarettes and alcoholic beverages to minors. It is pointed out that the record contains testimony to the effect that children of tender years (even ages 10 and 11) have sought abortions. Thus, a State's permitting a child to obtain an abortion without the counsel of an adult "who has responsi-

bility or concern for the child would constitute an irresponsible abdication of the State's duty to protect the welfare of minors." *Id.,* at 44. Parental discretion, too, has been protected from unwarranted or unreasonable interference from the State, citing *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972). Finally, it is said that § 3 (4) imposes no additional burden on the physician because even prior to the passage of the Act the physician would require parental consent before performing an abortion on a minor.

The appellants, in their turn, emphasize that no other Missouri statute specifically requires the additional consent of a minor's parent for medical or surgical treatment, and that in Missouri a minor legally may consent to medical services for pregnancy (excluding abortion), venereal disease, and drug abuse. Mo. Rev. Stat. §§ 431.061–431.063 (Supp. 1975). The result of § 3 (4), it is said, "is the ultimate supremacy of the parents' desires over those of the minor child, the pregnant patient." Brief for Appellants 93. It is noted that in Missouri a woman under the age of 18 who marries with parental consent does not require parental consent to abort, and yet her contemporary who has chosen not to marry must obtain parental approval.

The District Court majority recognized that, in contrast to § 3 (3), the State's interest in protecting the mutuality of a marriage relationship is not present with respect to § 3 (4). It found "a compelling basis," however, in the State's interest "in safeguarding the authority of the family relationship." 392 F. Supp., at 1370. The dissenting judge observed that one could not seriously argue that a minor must submit to an abortion if her parents insist, and he could not see "why she would not be entitled to the same right of self-determination now

explicitly accorded to adult women, provided she is sufficiently mature to understand the procedure and to make an intelligent assessment of her circumstances with the advice of her physician." *Id.,* at 1376.

Of course, much of what has been said above, with respect to § 3 (3), applies with equal force to § 3 (4). Other courts that have considered the parental-consent issue in the light of *Roe* and *Doe,* have concluded that a statute like § 3 (4) does not withstand constitutional scrutiny. See, *e. g., Poe* v. *Gerstein,* 517 F. 2d, at 792; *Wolfe* v. *Schroering,* 388 F. Supp., at 636–637; *Doe* v. *Rampton,* 366 F. Supp., at 193, 199; *State* v. *Koome,* 84 Wash. 2d 901, 530 P. 2d 260 (1975).

We agree with appellants and with the courts whose decisions have just been cited that the State may not impose a blanket provision, such as § 3 (4), requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor during the first 12 weeks of her pregnancy. Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent.

Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. See, *e. g., Breed* v. *Jones,* 421 U. S. 519 (1975); *Goss* v. *Lopez,* 419 U. S. 565 (1975); *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969); *In re Gault,* 387 U. S. 1 (1967). The Court indeed, however, long has recognized that the State has somewhat broader authority to regulate the activities of children than of adults.

*Prince* v. *Massachusetts,* 321 U. S., at 170; *Ginsberg* v. *New York,* 390 U. S. 629 (1968). It remains, then, to examine whether there is any significant state interest in conditioning an abortion on the consent of a parent or person *in loco parentis* that is not present in the case of an adult.

One suggested interest is the safeguarding of the family unit and of parental authority. 392 F. Supp., at 1370. It is difficult, however, to conclude that providing a parent with absolute power to overrule a determination, made by the physician and his minor patient, to terminate the patient's pregnancy will serve to strengthen the family unit. Neither is it likely that such veto power will enhance parental authority or control where the minor and the nonconsenting parent are so fundamentally in conflict and the very existence of the pregnancy already has fractured the family structure. Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant.

We emphasize that our holding that § 3 (4) is invalid does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy. See *Bellotti* v. *Baird, post,* p. 132. The fault with § 3 (4) is that it imposes a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and does so without a sufficient justification for the restriction. It violates the strictures of *Roe* and *Doe.*

### E

*Saline amniocentesis.* Section 9 of the statute prohibits the use of saline amniocentesis, as a method or technique of abortion, after the first 12 weeks of preg-

nancy. It describes the method as one whereby the amniotic fluid is withdrawn and "a saline or other fluid" is inserted into the amniotic sac. The statute imposes this proscription on the ground that the technique "is deleterious to maternal health," and places it in the form of a legislative finding. Appellants challenge this provision on the ground that it operates to preclude virtually all abortions after the first trimester. This is so, it is claimed, because a substantial percentage, in the neighborhood of 70% according to the testimony, of all abortions performed in the United States after the first trimester are effected through the procedure of saline amniocentesis. Appellants stress the fact that the alternative methods of hysterotomy and hysterectomy are significantly more dangerous and critical for the woman than the saline technique; they also point out that the mortality rate for normal childbirth exceeds that where saline amniocentesis is employed. Finally, appellants note that the perhaps safer alternative of prostaglandin instillation, suggested and strongly relied upon by the appellees, at least at the time of the trial, is not yet widely used in this country.

We held in *Roe* that after the first stage, "the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health." 410 U. S., at 164. The question with respect to § 9 therefore is whether the flat prohibition of saline amniocentesis is a restriction which "reasonably relates to the preservation and protection of maternal health." *Id.*, at 163. The appellees urge that what the Missouri General Assembly has done here is consistent with that guideline and is buttressed by substantial supporting medical evidence in the record to which this Court should defer.

The District Court's majority determined, on the basis of the evidence before it, that the maternal mortality rate in childbirth does, indeed, exceed the mortality rate where saline amniocentesis is used. Therefore, the majority acknowledged, § 9 could be upheld only if there were safe alternative methods of inducing abortion after the first 12 weeks. 392 F. Supp., at 1373. Referring to such methods as hysterotomy, hysterectomy, "mechanical means of inducing abortion," and prostaglandin injection, the majority said that at least the latter two techniques were safer than saline. Consequently, the majority concluded, the restriction in § 9 could be upheld as reasonably related to maternal health.

We feel that the majority, in reaching its conclusion, failed to appreciate and to consider several significant facts. First, it did not recognize the prevalence, as the record conclusively demonstrates, of the use of saline amniocentesis as an accepted medical procedure in this country; the procedure, as noted above, is employed in a substantial majority (the testimony from both sides ranges from 68% to 80%) of all post-first-trimester abortions. Second, it failed to recognize that at the time of trial, there were severe limitations on the availability of the prostaglandin technique, which, although promising, was used only on an experimental basis until less than two years before. See *Wolfe* v. *Schroering,* 388 F. Supp., at 637, where it was said that at that time (1974), there were "no physicians in Kentucky competent in the technique of prostaglandin amnio infusion." And appellees offered no evidence that prostaglandin abortions were available in Missouri.[12] Third, the statute's

---

[12] In response to MR. JUSTICE WHITE's criticism that the prostaglandin method of inducing abortion was available in Missouri, either at the time the Act was passed or at the time of trial, we make the following observations. First, there is no evidence in the record

reference to the insertion of "a saline or other fluid" appears to include within its proscription the intra-amniotic injection of prostaglandin itself and other methods that may be developed in the future and that may prove highly effective and completely safe. Finally, the majority did not consider the anomaly inherent in § 9 when it proscribes the use of saline but does not prohibit techniques that are many times more likely to result in maternal death. See 392 F. Supp., at 1378 n. 8 (dissenting opinion).

These unappreciated or overlooked factors place the State's decision to bar use of the saline method in a completely different light. The State, through § 9, would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth. More-

---

to which our Brother has pointed that demonstrates that the prostaglandin method was or is available in Missouri. Second, the evidence presented to the District Court does not support such a view. Until January 1974 prostaglandin was used only on an experimental basis in a few medical centers. And, at the time the Missouri General Assembly proscribed saline, the sole distributor of prostaglandin "restricted sales to around twenty medical centers from coast to coast." Brief for Appellee Danforth 68.

It is clear, therefore, that at the time the Missouri General Assembly passed the Act, prostaglandin was not available, in any meaningful sense of that term. Because of this undisputed fact, it was incumbent upon appellees to show that at the time of trial in 1974 prostaglandin was available. They failed to do so. Indeed, appellees' expert witness, on whose testimony the dissenting opinion relies, does not fill this void. He was able to state only that prostaglandin was used in a limited way until shortly before trial and that he "would think" that it was more readily available at the time of trial. Tr. 335. Such an experimental and limited use of prostaglandin throughout the country does not make it available or accessible to concerned persons in Missouri.

over, as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

As so viewed, particularly in the light of the present unavailability—as demonstrated by the record—of the prostaglandin technique, the outright legislative proscription of saline fails as a reasonable regulation for the protection of maternal health. It comes into focus, instead, as an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks. As such, it does not withstand constitutional challenge. See *Wolfe* v. *Schroering*, 388 F. Supp., at 637.

## F

*Recordkeeping.* Sections 10 and 11 of the Act impose recordkeeping requirements for health facilities and physicians concerned with abortions irrespective of the pregnancy stage. Under § 10, each such facility and physician is to be supplied with forms "the purpose and function of which shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law." The statute states that the information on the forms "shall be confidential and shall be used only for statistical purposes." The "records, however, may be inspected and health data acquired by local, state, or national public health officers." Under § 11 the records are to be kept for seven years in the permanent files of the health facility where the abortion was performed.

Appellants object to these reporting and recordkeeping provisions on the ground that they, too, impose an extra

layer and burden of regulation, and that they apply throughout all stages of pregnancy. All the judges of the District Court panel, however, viewed these provisions as statistical requirements "essential to the advancement of medical knowledge," and as nothing that would "restrict either the abortion decision itself or the exercise of medical judgment in performing an abortion." 392 F. Supp., at 1374.

One may concede that there are important and perhaps conflicting interests affected by recordkeeping requirements. On the one hand, maintenance of records indeed may be helpful in developing information pertinent to the preservation of maternal health. On the other hand, as we stated in *Roe,* during the first stage of pregnancy the State may impose no restrictions or regulations governing the medical judgment of the pregnant woman's attending physician with respect to the termination of her pregnancy. 410 U. S., at 163, 164. Furthermore, it is readily apparent that one reason for the recordkeeping requirement, namely, to assure that all abortions in Missouri are performed in accordance with the Act, fades somewhat into insignificance in view of our holding above as to spousal and parental consent requirements.

Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible. This surely is so for the period after the first stage of pregnancy, for then the State may enact substantive as well as recordkeeping regulations that are reasonable means of protecting maternal health. As to the first stage, one may argue forcefully, as the appellants do, that the State should not be able to impose any recordkeeping requirements that significantly differ from those imposed with respect to other,

and comparable, medical or surgical procedures. We conclude, however, that the provisions of §§ 10 and 11, while perhaps approaching impermissible limits, are not constitutionally offensive in themselves. Recordkeeping of this kind, if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment.[13] The added requirements for confidentiality, with the sole exception for public health officers, and for retention for seven years, a period not unreasonable in length, assist and persuade us in our determination of the constitutional limits. As so regarded, we see no legally significant impact or consequence on the abortion decision or on the physician-patient relationship. We naturally assume, furthermore, that these recordkeeping and record-maintaining provisions will be interpreted and enforced by Missouri's Division of Health in the light of our decision with respect to the Act's other provisions, and that, of course, they will not be utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction. Obviously, the State may not require execution of spousal and parental consent forms that have been invalidated today.

## G

*Standard of care.* Appellee Danforth in No. 74–1419 appeals from the unanimous decision of the District

[13] We note that in Missouri physicians must participate in the reporting of births and deaths, Mo. Rev. Stat. §§ 193.100 and 193.140 (1969), and communicable diseases, §§ 192.020 and 192.040 (1969), and that their use of controlled substances is rigidly monitored by the State, §§ 195.010–195.545 (1969 and Supp. 1975).

Court that § 6 (1) of the Act is unconstitutional. That section provides:

> "No person who performs or induces an abortion shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who shall fail to take such measures to encourage or to sustain the life of the child, and the death of the child results, shall be deemed guilty of manslaughter . . . . Further, such physician or other person shall be liable in an action for damages."

The District Court held that the first sentence was unconstitutionally overbroad because it failed to exclude from its reach the stage of pregnancy prior to viability. 392 F. Supp., at 1371.

The Attorney General argues that the District Court's interpretation is erroneous and unnecessary. He claims that the first sentence of § 6 (1) establishes only the general standard of care that applies to the person who performs the abortion, and that the second sentence describes the circumstances when that standard of care applies, namely, when a live child results from the procedure. Thus, the first sentence, it is said, despite its reference to the fetus, has no application until a live birth results.

The appellants, of course, agree with the District Court. They take the position that § 6 (1) imposes its standard of care upon the person performing the abortion even though the procedure takes place before viability. They argue that the statute on its face effectively precludes abortion and was meant to do just that.

We see nothing that requires federal-court abstention on this issue. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437–439 (1971); *Kusper* v. *Pontikes,* 414 U. S. 51, 54–55 (1973). And, like the three judges of the District Court, we are unable to accept the appellee's sophisticated interpretation of the statute. Section 6 (1) requires the physician to exercise the prescribed skill, care, and diligence to preserve the life and health of the *fetus.* It does not specify that such care need be taken only after the stage of viability has been reached. As the provision now reads, it impermissibly requires the physician to preserve the life and health of the fetus, whatever the stage of pregnancy. The fact that the second sentence of § 6 (1) refers to a criminal penalty where the physician fails "to take such measures to encourage or to sustain the life of the *child,* and the death of the *child* results" (emphasis supplied), simply does not modify the duty imposed by the previous sentence or limit that duty to pregnancies that have reached the stage of viability.

The appellees finally argue that if the first sentence of § 6 (1) does not survive constitutional attack, the second sentence does, and, under the Act's severability provision, § B, is severable from the first. The District Court's ruling of unconstitutionality, 392 F. Supp., at 1371, made specific reference to the first sentence, but its conclusion of law and its judgment invalidated all of § 6 (1). *Id.,* at 1374; Jurisdictional Statement A–34 in No. 74–1419. Appellee Danforth's motion to alter or amend the judgment, so far as the second sentence of § 6 (1) was concerned, was denied by the District Court. *Id.,* at A–39.

We conclude, as did the District Court, that § 6 (1) must stand or fall as a unit. Its provisions are inextricably bound together. And a physician's or other person's criminal failure to protect a liveborn infant surely

will be subject to prosecution in Missouri under the State's criminal statutes.

The judgment of the District Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

## H. C. S. HOUSE BILL NO. 1211

AN ACT relating to abortion with penalty provisions and emergency clause.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

Section 1. It is the intention of the general assembly of the state of Missouri to reasonably regulate abortion in conformance with the decisions of the supreme court of the United States.

Section 2. Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purpose of this act shall be given the meaning ascribed to them:

(1) "Abortion," the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child;

(2) "Viability," that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems;

(3) "Physician," any person licensed to practice medi-

cine in this state by the state board of registration of the healing arts.

Section 3. No abortion shall be performed prior to the end of the first twelve weeks of pregnancy except:

(1) By a duly licensed, consenting physician in the exercise of his best clinical medical judgment.

(2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion.

(3) With the written consent of the woman's spouse, unless the abortion is certified by a licensed physician to be necessary in order to preserve the life of the mother.

(4) With the written consent of one parent or person in loco parentis of the woman if the woman is unmarried and under the age of eighteen years, unless the abortion is certified by a licensed physician as necessary in order to preserve the life of the mother.

Section 4. No abortion performed subsequent to the first twelve weeks of pregnancy shall be performed except where the provisions of section 3 of this act are satisfied and in a hospital.

Section 5. No abortion not necessary to preserve the life or health of the mother shall be performed unless the attending physician first certifies with reasonable medical certainty that the fetus is not viable.

Section 6. (1) No person who performs or induces an abortion shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who

shall fail to take such measures to encourage or to sustain the life of the child, and the death of the child results, shall be deemed guilty of manslaughter and upon conviction shall be punished as provided in Section 559.-140, RSMo. Further, such physician or other person shall be liable in an action for damages as provided in Section 537.080, RSMo.

(2) Whoever, with intent to do so, shall take the life of a premature infant aborted alive, shall be guilty of murder of the second degree.

(3) No person shall use any fetus or premature infant aborted alive for any type of scientific, research, laboratory or other kind of experimentation either prior to or subsequent to any abortion procedure except as necessary to protect or preserve the life and health of such premature infant aborted alive.

Section 7. In every case where a live born infant results from an attempted abortion which was not performed to save the life or health of the mother, such infant shall be an abandoned ward of the state under the jurisdiction of the juvenile court wherein the abortion occurred, and the mother and father, if he consented to the abortion, of such infant, shall have no parental rights or obligations whatsoever relating to such infant, as if the parental rights had been terminated pursuant to section 211.411, RSMo. The attending physician shall forthwith notify said juvenile court of the existence of such live born infant.

Section 8. Any woman seeking an abortion in the state of Missouri shall be verbally informed of the provisions of section 7 of this act by the attending physician and the woman shall certify in writing that she has been so informed.

Section 9. The general assembly finds that the method or technique of abortion known as saline amnio-

centesis whereby the amniotic fluid is withdrawn and a saline or other fluid is inserted into the amniotic sac for the purpose of killing the fetus and artificially inducing labor is deleterious to maternal health and is hereby prohibited after the first twelve weeks of pregnancy.

Section 10. 1. Every health facility and physician shall be supplied with forms promulgated by the division of health, the purpose and function of which shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law.

2. The forms shall be provided by the state division of health.

3. All information obtained by physician, hospital, clinic or other health facility from a patient for the purpose of preparing reports to the division of health under this section or reports received by the division of health shall be confidential and shall be used only for statistical purposes. Such records, however, may be inspected and health data acquired by local, state, or national public health officers.

Section 11. All medical records and other documents required to be kept shall be maintained in the permanent files of the health facility in which the abortion was performed for a period of seven years.

Section 12. Any practitioner of medicine, surgery, or nursing, or other health personnel who shall willfully and knowingly do or assist any action made unlawful by this act shall be subject to having his license, application for license, or authority to practice his profession as a physician, surgeon, or nurse in the state of Missouri

rejected or revoked by the appropriate state licensing board.

Section 13. Any physician or other person who fails to maintain the confidentiality of any records or reports required under this act is guilty of a misdemeanor and, upon conviction, shall be punished as provided by law.

Section 14. Any person who contrary to the provisions of this act knowingly performs or aids in the performance of any abortion or knowingly fails to perform any action required by this act shall be guilty of a misdemeanor and, upon conviction, shall be punished as provided by law.

Section 15. Any person who is not a licensed physician as defined in section 2 of this act who performs or attempts to perform an abortion on another as defined in subdivision (1) of section 2 of this act, is guilty of a felony, and upon conviction, shall be imprisoned by the department of corrections for a term of not less than two years nor more than seventeen years.

Section 16. Nothing in this act shall be construed to exempt any person, firm, or corporation from civil liability for medical malpractice for negligent acts or certification under this act.

Section A. Because of the necessity for immediate state action to regulate abortions to protect the lives and health of citizens of this state, this act is deemed necessary for the immediate preservation of the public health, welfare, peace and safety, and is hereby declared to be an emergency act within the meaning of the constitution, and this act shall be in full force and effect upon its passage and approval.

Section B. If any provision of this Act or the application thereof to any person or circumstance shall be

held invalid, such invalidity does not affect the provisions or application of this Act which can be given effect without the invalid provisions or applications, and to this end the provisions of this Act are declared to be severable.

Approved June 14, 1974.
Effective June 14, 1974.

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL joins, concurring.

While joining the Court's opinion, I write separately to indicate my understanding of some of the constitutional issues raised by this litigation.

With respect to the definition of viability in § 2 (2) of the Act, it seems to me that the critical consideration is that the statutory definition has almost no operative significance. The State has merely required physicians performing abortions to *certify* that the fetus to be aborted is not viable. While the physician may be punished for failing to issue a certification, he may not be punished for erroneously concluding that the fetus is not viable. There is thus little chance that a physician's professional decision to perform an abortion will be "chilled."

I agree with the Court that the patient-consent provision in § 3 (2) is constitutional. While § 3 (2) obviously regulates the abortion decision during all stages of pregnancy, including the first trimester, I do not believe it conflicts with the statement in *Roe* v. *Wade*, 410 U. S. 113, 163, that "for the period of pregnancy prior to [approximately the end of the first trimester] the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment

may be effectuated by an abortion free of interference by the State." That statement was made in the context of invalidating a state law aimed at thwarting a woman's decision to have an abortion. It was not intended to preclude the State from enacting a provision aimed at ensuring that the abortion decision is made in a knowing, intelligent, and voluntary fashion.

As to the provision of the law that requires a husband's consent to an abortion, § 3 (3), the primary issue that it raises is whether the State may constitutionally recognize and give effect to a right on his part to participate in the decision to abort a jointly conceived child. This seems to me a rather more difficult problem than the Court acknowledges. Previous decisions have recognized that a man's right to father children and enjoy the association of his offspring is a constitutionally protected freedom. See *Stanley* v. *Illinois,* 405 U. S. 645; *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535. But the Court has recognized as well that the Constitution protects "a *woman's* decision whether or not to terminate her pregnancy." *Roe* v. *Wade, supra,* at 153 (emphasis added). In assessing the constitutional validity of § 3 (3) we are called upon to choose between these competing rights. I agree with the Court that since "it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy . . . the balance weighs in her favor." *Ante,* at 71.

With respect to the state law's requirement of parental consent, § 3 (4), I think it clear that its primary constitutional deficiency lies in its imposition of an absolute limitation on the minor's right to obtain an abortion. The Court's opinion today in *Bellotti* v. *Baird, post,* at 147–148, suggests that a materially different constitutional issue would be presented under a provision requiring parental consent or consultation in most cases

but providing for prompt (i) judicial resolution of any disagreement between the parent and the minor, or (ii) judicial determination that the minor is mature enough to give an informed consent without parental concurrence or that abortion in any event is in the minor's best interest. Such a provision would not impose parental approval as an absolute condition upon the minor's right but would assure in most instances consultation between the parent and child.[1]

There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place.[2]

---

[1] For some of the considerations that support the State's interest in encouraging parental consent, see the opinion of MR. JUSTICE STEVENS, concurring in part and dissenting in part. *Post,* at 102–105.

[2] The mode of operation of one such clinic is revealed by the record in *Bellotti* v. *Baird, post,* p. 132, and accurately described by appellants in that case:

"The counseling . . . occurs entirely on the day the abortion is to be performed . . . . It lasts for two hours and takes place in groups that include both minors and adults who are strangers to one another . . . . The physician takes no part in this counseling process . . . . Counseling is typically limited to a description of abortion procedures, possible complications, and birth control techniques . . . .

"The abortion itself takes five to seven minutes . . . . The physician has no prior contact with the minor, and on the days that abortions are being performed at the [clinic], the physician, . . . may be performing abortions on many other adults and minors . . . . On busy days patients are scheduled in separate groups, consisting

As to the constitutional validity of § 9 of the Act, prohibiting the use of the saline amniocentesis procedure, I agree fully with the views expressed by MR. JUSTICE STEVENS.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

In *Roe* v. *Wade,* 410 U. S. 113 (1973), this Court recognized a right to an abortion free from state prohibition. The task of policing this limitation on state police power is and will be a difficult and continuing venture in substantive due process. However, even accepting *Roe* v. *Wade,* there is nothing in the opinion in that case and nothing articulated in the Court's opinion in this case which justifies the invalidation of four provisions of House Committee Substitute for House Bill No. 1211 (hereafter Act) enacted by the Missouri 77th General Assembly in 1974 in response to *Roe* v. *Wade.* Accordingly, I dissent, in part.

I

*Roe* v. *Wade, supra,* at 163, holds that until a fetus becomes viable, the interest of the State in the life or potential life it represents is outweighed by the interest of the mother in choosing "whether or not to terminate her pregnancy." 410 U. S., at 153. Section 3 (3) of the Act provides that a married woman may not obtain an abortion without her husband's consent. The Court strikes down this statute in one sentence. It says that "since the State cannot . . . proscribe abortion . . . the State cannot delegate authority to any particular person,

---

usually of five patients . . . . After the abortion [the physician] spends a brief period with the minor and others in the group in the recovery room . . . ." Brief for Appellants in No. 75–73, O. T. 1975, pp. 43–44.

even the spouse, to prevent abortion . . . ." *Ante,* at 69. But the State is not—under § 3 (3)—delegating to the husband the power to vindicate the *State's* interest in the future life of the fetus. It is instead recognizing that the husband has an interest of his own in the life of the fetus which should not be extinguished by the unilateral decision of the wife.[1] It by no means follows, from the fact that the mother's interest in deciding "whether or not to terminate her pregnancy" outweighs the *State's* interest in the potential life of the fetus, that the husband's interest is also outweighed and may not be protected by the State. A father's interest in having a child—perhaps his only child—may be unmatched by any other interest in his life. See *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972), and cases there cited. It is truly surprising that the majority finds in the United States Constitution, as it must in order to justify the result it reaches, a rule that the State must assign a greater value to a mother's decision to cut off a potential human life by abortion than to a father's decision to let it mature into a live child. Such a rule cannot be found there, nor can it be found in *Roe* v. *Wade, supra.* These are matters which a State should be able to decide free from the suffocating power of the federal judge, purporting to act in the name of the Constitution.

---

[1] There are countless situations in which the State prohibits conduct only when it is objected to by a private person most closely affected by it. Thus a State cannot forbid anyone to enter on private property with the owner's consent, but it may enact and enforce trespass laws against unauthorized entrances. It cannot forbid transfer of property held in tenancy by the entireties but it may require consent by both husband and wife to such a transfer. These situations plainly do not involve delegations of legislative power to private parties; and neither does the requirement in § 3 (3) that a woman not deprive her husband of his future child without his consent.

In describing the nature of a mother's interest in ter-mininating a pregnancy, the Court in *Roe* v. *Wade* mentioned only the post-birth burdens of rearing a child, 410 U. S., at 153, and rejected a rule based on her interest in controlling her own body during pregnancy. *Id.,* at 154. Missouri has a law which prevents a woman from putting a child up for adoption over her husband's objection, Mo. Rev. Stat. § 453.030 (1969). This law represents a judgment by the State that the mother's interest in avoiding the burdens of child rearing do not outweigh or snuff out the father's interest in participating in bringing up his own child. That law is plainly valid, but no more so than § 3 (3) of the Act now before us, resting as it does on precisely the same judgment.

## II

Section 3 (4) requires that an unmarried woman under 18 years of age obtain the consent of a parent or a person *in loco parentis* as a condition to an abortion. Once again the Court strikes the provision down in a sentence. It states: "Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy . . . ." *Ante,* at 74. The Court rejects the notions that the *State* has an interest in strengthening the family unit, or that the *parent* has an "independent interest" in the abortion decision, sufficient to justify § 3 (4) and apparently concludes that the provision is therefore unconstitutional. But the purpose of the parental-consent requirement is not merely to vindicate any interest of the parent or of the State. The purpose of the requirement is to vindicate the very right created in *Roe* v. *Wade, supra*—the right of the pregnant woman to decide

"whether *or not* to terminate her pregnancy." 410 U. S., at 153 (emphasis added). The abortion decision is unquestionably important and has irrevocable consequences whichever way it is made. Missouri is entitled to protect the minor unmarried woman from making the decision in a way which is not in her own best interests, and it seeks to achieve this goal by requiring parental consultation and consent. This is the traditional way by which States have sought to protect children from their own immature and improvident decisions; [2] and there is absolutely no reason expressed by the majority why the State may not utilize that method here.

### III

Section 9 of the Act prohibits abortion by the method known as saline amniocentesis—a method used at the time the Act was passed for 70% of abortions performed after the first trimester. Legislative history reveals that the Missouri Legislature viewed saline amniocentesis as far less safe a method of abortion than the so-called prostaglandin method. The court below took evidence on the question and summarized it as follows:

> "The record of trial discloses that use of the saline method exposes a woman to the danger of severe complications, regardless of the skill of the physician or the precaution taken. Saline may cause one or

---

[2] As MR. JUSTICE STEVENS states in his separate opinion, *post*, at 102:

"The State's interest in the welfare of its young citizens justifies a variety of protective measures. Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant."

more of the following conditions: Disseminated intravascular coagulation or 'consumptive coagulapathy' (disruption of the blood clotting mechanism [Dr. Warren, Tr. 57–58; Dr. Klaus, Tr. 269–270; Dr. Anderson, Tr. 307; Defts' Exs. H & M]), which may result in severe bleeding and possibly death (Dr. Warren, Tr. 58); hypernatremia (increase in blood sodium level), which may lead to convulsions and death (Dr. Klaus, Tr. 268); and water intoxication (accumulated water in the body tissue which may occur when oxytoxin is used in conjunction with the injection of saline), resulting in damage to the central nervous system or death (Dr. Warren, Tr. 76; Dr. Klaus, Tr. 270–271; Dr. Anderson, Tr. 310; Defts' Ex. L). There is also evidence that saline amniocentesis causes massive tissue destruction to the inside of the uterus (Dr. Anderson, Tr. 308)." 392 F. Supp. 1362, 1372–1373 (1975).

The District Court also cited considerable evidence establishing that the prostaglandin method is safer. In fact, the Chief of Obstetrics at Yale University, Dr. Anderson, suggested that "physicians should be liable for malpractice if they chose saline over prostaglandin after having been given all the facts on both methods." *Id.,* at 1373. The Court nevertheless reverses the decision of the District Court sustaining § 9 against constitutional challenge. It does so apparently because saline amniocentesis was widely used before the Act was passed; because the prostaglandin method was seldom used and was not generally available; and because other abortion techniques more dangerous than saline amniocentesis were not banned. At bottom the majority's holding—as well as the concurrence—rests on its *factual* finding that the prostaglandin method is unavailable to the women of

Missouri. It therefore concludes that the ban on the saline method is "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks," *ante,* at 79. This factual finding was not made either by the majority or by the dissenting judge below. Appellants have not argued that the record below supports such a finding. In fact the record below does not support such a finding. There is *no* evidence in the record that women in Missouri will be unable to obtain abortions by the prostaglandin method. What evidence there is in the record on this question supports the contrary conclusion.[3] The record discloses that the prostaglandin method of abortion was the country's second most common method of abortion during the second trimester, Tr. 42, 89–90; that although the prostaglandin method had previously been available only on an experimental basis, it was, at the time of trial available in "small hospitals all over the country," *id.,* at 342; that in another year or so the prostaglandin method would become—even in the absence of legislation on the subject— the most prevalent method. Anderson deposition, at 69. Moreover, one doctor quite sensibly testified that if the saline method were banned, hospitals would quickly switch to the prostaglandin method.

The majority relies on the testimony of one doctor that—as already noted—prostaglandin had been available on an experimental basis only until January 1, 1974; and that its manufacturer, the Upjohn Co., restricted its sales to large medical centers for the following six months, after which sales were to be unrestricted. Tr.

---

[3] The absence of more evidence on the subject in the record seems to be a result of the fact that the claim that the prostaglandin method is unavailable was not part of plaintiffs' litigating strategy below.

334–335. In what manner this evidence supports the proposition that prostaglandin is unavailable to the women of Missouri escapes me. The statute involved in this litigation was passed on June 14, 1974; evidence was taken in July 1974; the District Court's decree sustaining the ban on the saline method which this Court overturns was entered in January 1975; and this Court declares the statute unconstitutional in July 1976. There is simply no evidence in the record that prostaglandin was or is unavailable at any time relevant to this case. Without such evidence and without any factual finding by the court below this Court cannot properly strike down a statute passed by one of the States. Of course, there is no burden on a State to establish the constitutionality of one of its laws. Absent proof of a fact essential to its unconstitutionality, the statute remains in effect.

The only other basis for its factual finding which the majority offers is a citation to *another* case—*Wolfe* v. *Schroering*, 388 F. Supp. 631, 637 (WD Ky. 1974)—in which a different court concluded that the record in its case showed the prostaglandin method to be unavailable in another State—Kentucky—at another time—two years ago. This case must be decided on its own record. I am not yet prepared to accept the notion that normal rules of law, procedure, and constitutional adjudication suddenly become irrelevant solely because a case touches on the subject of abortion. The majority's finding of fact that women in Missouri will be unable to obtain abortions after the first trimester if the saline method is banned is wholly unjustifiable.

In any event, the point of § 9 is to change the practice under which most abortions were performed under the saline amniocentesis method and to make the safer prostaglandin method generally available. It promises to

achieve that result, if it remains operative, and the evidence discloses that the result is a desirable one or at least that the legislature could have so viewed it. That should end our inquiry, unless we purport to be not only the country's continuous constitutional convention but also its *ex officio* medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States.

## IV

Section 6 (1) of the Act provides:

> "No person who performs or induces an abortion shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who shall fail to take such measures to encourage or to sustain the life of the child, and the death of the child results, shall be deemed guilty of manslaughter . . . . Further, such physician or other person shall be liable in an action for damages."

If this section is read in any way other than through a microscope, it is plainly intended to require that, where a "fetus [may have] the capability of meaningful life outside the mother's womb," *Roe* v. *Wade,* 410 U. S., at 163, the abortion be handled in a way which is designed to preserve that life notwithstanding the mother's desire to terminate it. Indeed, even looked at through a microscope the statute seems to go no further. It requires a physician to exercise "*that* degree of professional skill . . . to preserve the . . . fetus," which he would be required to exercise if the mother wanted a live child. Plainly,

if the pregnancy is to be terminated at a time when there is no chance of life outside the womb, a physician would not be required to exercise any care or skill to preserve the life of the fetus during abortion no matter what the mother's desires. The statute would appear then to operate only in the gray area after the fetus *might* be viable but while the physician is still able to certify "with reasonable medical certainty that the fetus is not viable." See § 5 of the Act which flatly prohibits abortions absent such a certification. Since the State has a compelling interest, sufficient to outweigh the mother's desire to kill the fetus, when the "fetus . . . has the capability of meaningful life outside the mother's womb," *Roe* v. *Wade, supra,* at 163, the statute is constitutional.

Incredibly, the Court reads the statute instead to require "the physician to preserve the life and health of the fetus, whatever the stage of pregnancy," *ante,* at 83, thereby attributing to the Missouri Legislature the strange intention of passing a statute with absolutely no chance of surviving constitutional challenge under *Roe* v. *Wade, supra.*

The Court compounds its error by also striking down as unseverable the wholly unobjectionable requirement in the second sentence of § 6 (1) that where an abortion produces a live child, steps must be taken to sustain its life. It explains its result in two sentences:

> "We conclude, as did the District Court, that § 6 (1) must stand or fall as a unit. Its provisions are inextricably bound together." *Ante,* at 83.

The question whether a constitutional provision of state law is severable from an unconstitutional provision is *entirely* a question of the intent of the state legislature. There is not the slightest reason to suppose that the Missouri Legislature would not require proper care

for live babies just because it cannot require physicians performing abortions to take care to preserve the life of fetuses. The Attorney General of Missouri has argued here that the *only* intent of § 6 (1) was to require physicians to support a live baby which resulted from an abortion.

At worst, § 6 (1) is ambiguous on both points and the District Court should be directed to abstain until a construction may be had from the state courts. Under no circumstances should § 6 (1) be declared unconstitutional at this point.[4]

## V

I join the judgment and opinion of the Court insofar as it upholds the other portions of the Act against constitutional challenge.

MR. JUSTICE STEVENS, concurring in part and dissenting in part.

With the exception of Parts IV–D and IV–E, I join the Court's opinion.

In *Roe* v. *Wade*, 410 U. S. 113, the Court held that a woman's right to decide whether to abort a pregnancy is entitled to constitutional protection. That decision, which is now part of our law, answers the question discussed in Part IV–E of the Court's opinion, but merely poses the question decided in Part IV–D.

If two abortion procedures had been equally accessible to Missouri women, in my judgment the United States Constitution would not prevent the state legis-

---

[4] The majority's construction of state law is, of course, not binding on the Missouri courts. If they should disagree with the majority's reading of state law on one or both of the points treated by the majority, the State could validly enforce the relevant parts of the statute—at least against all those people not parties to this case. Cf. *Dombrowski* v. *Pfister*, 380 U. S. 479, 492 (1965).

lature from outlawing the one it found to be less safe even though its conclusion might not reflect a unanimous consensus of informed medical opinion. However, the record indicates that when the Missouri statute was enacted, a prohibition of the saline amniocentesis procedure was almost tantamount to a prohibition of any abortion in the State after the first 12 weeks of pregnancy. Such a prohibition is inconsistent with the essential holding of *Roe* v. *Wade* and therefore cannot stand.

In my opinion, however, the parental-consent requirement is consistent with the holding in *Roe*. The State's interest in the welfare of its young citizens justifies a variety of protective measures. Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant. The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible. Therefore, the holding in *Roe* v. *Wade* that the abortion decision is entitled to constitutional protection merely emphasizes the importance of the decision; it does not lead to the conclusion that the state legislature has no power to enact legislation for the purpose of protecting a young pregnant woman from the consequences of an incorrect decision.

The abortion decision is, of course, more important than the decision to attend or to avoid an adult motion picture, or the decision to work long hours in a

factory. It is not necessarily any more important than the decision to run away from home or the decision to marry. But even if it is the most important kind of a decision a young person may ever make, that assumption merely enhances the quality of the State's interest in maximizing the probability that the decision be made correctly and with full understanding of the consequences of either alternative.

The Court recognizes that the State may insist that the decision not be made without the benefit of medical advice. But since the most significant consequences of the decision are not medical in character, it would seem to me that the State may, with equal legitimacy, insist that the decision be made only after other appropriate counsel has been had as well. Whatever choice a pregnant young woman makes—to marry, to abort, to bear her child out of wedlock—the consequences of her decision may have a profound impact on her entire future life. A legislative determination that such a choice will be made more wisely in most cases if the advice and moral support of a parent play a part in the decisionmaking process is surely not irrational. Moreover, it is perfectly clear that the parental-consent requirement will necessarily involve a parent in the decisional process.

If there is no parental-consent requirement, many minors will submit to the abortion procedure without ever informing their parents. An assumption that the parental reaction will be hostile, disparaging, or violent no doubt persuades many children simply to bypass parental counsel which would in fact be loving, supportive, and, indeed, for some indispensable. It is unrealistic, in my judgment, to assume that every parent-child relationship is either (a) so perfect that communication and accord will take place routinely or

(b) so imperfect that the absence of communication reflects the child's correct prediction that the parent will exercise his or her veto arbitrarily to further a selfish interest rather than the child's interest. A state legislature may conclude that most parents will be primarily interested in the welfare of their children, and further, that the imposition of a parental-consent requirement is an appropriate method of giving the parents an opportunity to foster that welfare by helping a pregnant distressed child to make and to implement a correct decision.

The State's interest is not dependent on an estimate of the impact the parental-consent requirement may have on the total number of abortions that may take place. I assume that parents will sometimes prevent abortions which might better be performed; other parents may advise abortions that should not be performed. Similarly, even doctors are not omniscient; specialists in performing abortions may incorrectly conclude that the immediate advantages of the procedure outweigh the disadvantages which a parent could evaluate in better perspective. In each individual case factors much more profound than a mere medical judgment may weigh heavily in the scales. The overriding consideration is that the right to make the choice be exercised as wisely as possible.

The Court assumes that parental consent is an appropriate requirement if the minor is not capable of understanding the procedure and of appreciating its consequences and those of available alternatives. This assumption is, of course, correct and consistent with the predicate which underlies all state legislation seeking to protect minors from the consequences of decisions they are not yet prepared to make. In all such situations chronological age has been the basis for imposition of a restraint on the minor's freedom of choice even though

it is perfectly obvious that such a yardstick is imprecise and perhaps even unjust in particular cases. The Court seems to assume that the capacity to conceive a child and the judgment of the physician are the only constitutionally permissible yardsticks for determining whether a young woman can independently make the abortion decision. I doubt the accuracy of the Court's empirical judgment. Even if it were correct, however, as a matter of constitutional law I think a State has power to conclude otherwise and to select a chronological age as its standard.

In short, the State's interest in the welfare of its young citizens is sufficient, in my judgment, to support the parental-consent requirement.