**MOBILE WOMEN'S MEDICAL CLINIC, INC. et al., Plaintiffs,**

v.

**BOARD OF COMMISSIONERS OF the CITY OF MOBILE et al., Defendants.**

Civ. A. No. 76–592–H.

United States District Court,
S. D. Alabama, S. D.

Jan. 21, 1977.

**332**

Howard A. Mandell, Montgomery, Ala., for plaintiffs.

William H. Brigham, Asst. City Atty., City of Mobile, Mobile, Ala., for Board of Commissioners of City of Mobile and Doyle, Greenough & Mims.

This matter is under submission to the Court for decision on the motion of the plaintiffs for summary judgment which was heard December 20, 1976 and has now been fully briefed. At the hearing testimony was taken, evidence admitted, and arguments stated. The parties, at the conclusion, agreed to treat this hearing as a trial on the merits.

Briefly stated, the issue revolves around an abortion ordinance passed by the City of Mobile which has been attacked by the plaintiffs as being unconstitutional in that it violates plaintiffs' rights of privacy, equal protection, procedural and substantive due process; is void for vagueness and over-breadth; and is the result of a conspiracy. The issue is one which is fraught with emotion and is the vortex of a storm of controversy not only in Mobile, but across the United States. Both sides of the issue have expressed strong moral feelings which naturally compel them to strongly advocate their respective positions. Indeed, though the hearing which was conducted on December 20, 1976, did not involve passionate and heated outbursts of counsel, it was one at which the Court was impressed with the sure moral certainty exhibited by each side. It must be understood that this Court, by its ruling today, makes no attempt to delineate and separate the moral issues involved in this cause nor does it express an opinion

as to those moral issues since that is not the function of the Court on this point and especially since it is the opinion of this Court that the question involved is one which has been amply covered by legal precedent established by the United States Supreme Court and other Federal judicial bodies. Based upon these legal precedents and upon the facts found by the Court as expressed below, it is the opinion of this Court that the ordinance under consideration is unconstitutional in its attempts to abridge the rights of the parties to conduct first trimester abortions.

## FINDINGS OF FACT

1. This is an action brought pursuant to the First, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution and the provisions of Title 42, U.S.C.A., §§ 1983 and 1985(3) *et seq.*

2. The plaintiffs are Mobile Women's Medical Clinic (which owns a medical facility that plans to offer women a variety of services, including first trimester abortions); Ralph R. Robinson, (who is a medical doctor licensed to practice medicine in the State of Alabama and is medical director of the Mobile Women's Medical Clinic and who is responsible for the policies and procedures of that clinic and the performance of first trimester abortions at the clinic); and the National Organization of Women (which is a national organization with an Alabama chapter). The defendants are the City of Mobile Board of Commissioners, Robert Doyle, Jr., Gary Greenough, and Lambert Mims; the Mobile County Board of Health and its members; the Mobile County Health Officer, Dr. George Newburn; and the District Attorney for the County of Mobile, Charles Graddick. Except for the members of the Board of Commissioners of the City of Mobile, who are sued in both their individual and official capacities, the defendants are sued only in their official capacities. The ordinance in question was adopted by the Mobile County Board of Commissioners in July, 1976. The ordinance contains comprehensive regula-

tions concerning the performance of abortions in the City of Mobile.[1]

3. The Commissioners conceded in their depositions, which were admitted into evidence as plaintiffs' Exhibits 1, 2, and 3, that they knew nothing about abortion procedure and had not read the ordinance or the registrational requirements prior to the adoption of the ordinance.

4. Section II(a) of the ordinance provides that "nothing in this ordinance shall be construed to prohibit an abortion performed by an affiliated physician based upon his best clinical judgment that an abortion is necessary, subject to the provisions of this ordinance." The testimony of Dr. Newburn and Dr. Otts was that the word "necessary" meant to them "medically necessary".

5. The ordinance in Section I(e) prohibits a physician from performing abortions unless he has written hospital admission privileges and/or a comprehensive written contractual agreement with a physician qualified to provide such admission privileges. The ordinance further provides in Section I(d) that the abortion service itself have a written affiliation agreement with a licensed Mobile hospital and be located within a total transport time of fifteen minutes from such a hospital. The ordinance also prescribes requirements for facilities, equipment and supplies; admission and examination facilities; laboratory facilities; operating facilities; recovery rooms; staff qualifications; admission and examination procedures; tests to be performed; and other general operative and post-operative requirements.

6. Registration, regulation, and enforcement powers under the ordinance are given to the Mobile County Board of Health which, among other things, is empowered to refuse to register any facility which in the Board's opinion fails to comply with the ordinance.

7. The technique to be used in the actual performance of the abortions by the clinic is said to be the vacuum method which the

evidence shows has an extremely low percentage of complications arising from its use. Dr. Robinson, who has performed some 10,000 first trimester abortions in various parts of the country, has performed at least 1,000 abortions by this method in Birmingham, Alabama, and there has only been one complication there. Dr. Portman, who has performed somewhere between 3,000 and 4,000 first trimester abortions in Atlanta using this method, has had only one patient who was required to be hospitalized.

8. The City of Mobile, while comprehensively regulating abortion facilities and the physicians performing abortions, has not regulated other medical procedures, some of which are more dangerous to the patient's health. For instance, childbirth was acknowledged by Dr. O. M. Otts, a local doctor specializing in obstetrics and gynecology and Chairman of the Mobile County Board of Health, to have a higher mortality rate and be more complicated than first trimester abortions. Despite this fact, the evidence is uncontroverted that childbirth is unregulated by the City of Mobile, and a physician may deliver a child under any conditions at any place that he sees fit. Indeed, in Alabama, licensed midwives, who are neither doctors or nurses, may legally deliver children anywhere they desire, without having to have an affiliation agreement with a hospital or a physician or having to file a registration statement with the Board of Health. Dr. Otts also testified that his practice was not regulated by the City and that it was the product of his medical judgment. Dr. Portman and Dr. Robinson confirmed that a physician's practices and procedures were and should be the result of the physician's medical judgment.

9. The testimony of Dr. Otts and Dr. Cooner, President of the Medical Society of Mobile County, was that they did not know any need for the City to single out for regulation abortion and doctors performing abortions from other medical procedures and doctors performing those medical procedures.

1. A copy of the ordinance is appended hereto as Appendix A.

10. Dr. Robinson, a physician licensed in eighteen states to practice medicine, who invented an intrauterine birth control device, is a consultant for various drug firms, a Diplomate of the American Board of Obstetrics and Gynecology, serves as Chief of Obstetrics and Gynecology at Pineville Community Hospital in Pineville, Kentucky, and who has performed approximately 10,000 first trimester abortions, stated that the ordinance was not necessary. Indeed, a clinic similar to the one to be operated in Mobile is operated in Birmingham and elsewhere without the requirements of any ordinance such as adopted in Mobile. This sentiment was echoed by Dr. Portman, an expert witness in the field of Obstetrics and Gynecology who has himself performed approximately 3,000 to 4,000 first trimester abortions.

11. The ordinance is worded in such a way that it is difficult for this Court, as it was difficult for Dr. Otts, to define some of the terms utilized. For instance, Section X of the ordinance contains phraseology to the effect that "an abortion service . . shall be equipped with suitable furnishings and accommodations . . . ." Dr. Otts was unable to define what was meant by the term "suitable". There are other terms in the ordinance which appear to the Court to be vague and indefinite such as the requirement in Section XIII that "an adequately sized and separate recovery room or rooms in proximity to the operating facilities shall be provided."

12. The Board of Health does not have any standards or guidelines which would assist either the Court or a physician or abortion service governed by the ordinance in interpreting the ordinance. No similar or comparable ordinances regulating any other facet of medical clinic operation was called to the Court's attention. Indeed, the evidence was that none existed and no effort had been made to attempt to otherwise regulate a doctor's practice.

13. The extensive and exhaustive requirements of this ordinance, which have been previously discussed in these Findings, quite clearly apply to both first trimester abortions and abortions to be performed after the first trimester. Thus, the City is clearly attempting to regulate by this ordinance the availability and performance of first trimester abortions. There is testimony before the Court to the effect that a physician is unable in certain cases by a manual examination to pinpoint the age of the fetus, but there is also testimony before the Court that an experienced doctor is able to determine the age of the fetus from such a manual examination to within one week of its age 99.8% of the time. In addition, Dr. Robinson has testified that he does not perform abortions when he determines the age of the fetus to be more than eleven weeks. In any event, the Court is satisfied from the evidence that the manual examination by a qualified physician is sufficient to enable that physician to determine, as a matter of medical judgment, whether the fetus has reached or has passed the first trimester.

14. It was Dr. Otts' testimony that abortions in a clinic situation have been performed at the University of South Alabama Hospital because of the residents' and young doctors' recommendations, but that clinic was closed because of the excessive demand for its services. Because of this there is now in Mobile no clinic facility where an abortion may be obtained.

15. Plaintiffs have admitted that their sole concern in filing this lawsuit is to have the ordinance declared unconstitutional and of no further effect. They seek no individual relief from the named defendants.

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction of this cause and the parties hereto. Standing is conferred upon the Mobile Women's Medical Clinic and upon Dr. Robinson because of the financial interest of those parties. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Dr. Robinson also has standing since he is one against whom the statute directly operates in the event that he performs an abortion that does not meet the statutory requirements and thus he should not be required to await

and undergo a criminal prosecution as the sole means of seeking relief. *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The Alabama Chapter of NOW, a Nationwide Organization of Women has standing since it may assert its rights and the corresponding rights of its members and since those rights will be affected in a very real way by the challenged ordinance. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

■ 2. The defendants have argued that the Court should abstain on the ground that the ordinance is susceptible to State court interpretation which might avoid Federal constitutional interpretations. The Court does not agree with this contention of the defendants since it is the opinion of the Court that the overall effect of the statute is unambiguous and that no State court interpretation of the ordinance could render it constitutional. *See Arnold v. Sendak,* 416 F.Supp. 22 (S.D.Ind.1976), affirmed *per curiam,* —— U.S. ——, 97 S.Ct. 476, 50 L.Ed.2d 579.

3. The Court makes no conclusions of law as to the allegations of denial of procedural due process, substantive due process, or conspiracy.

■ 4. Excepting the "informed consent" provision of Section V(c), the ordinance, as applied to first trimester abortions is unconstitutional under the teachings of *Rowe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Briefly stated, that case held that a woman's right to privacy to some extent extended to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education. That right to privacy, which according to the Supreme Court is founded upon the Fourteenth Amendment's concept of personal liberty and restrictions upon State action, was held to be broad enough to encompass a woman's decision whether or not to terminate her pregnancy. 410 U.S. at 152–3, 93 S.Ct. 705. The Court further held that:

"The State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, whether she be a resident of the State or a non-resident who seeks medical consultation and treatment there, and that it has still *another* important and legitimate interest in protecting the potentiality of human life. These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'

"With respect to the state's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester. This is so because of the now-established medical fact, referred to above . . . that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably related to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like." *Id.* at 163, 93 S.Ct. at 731.

The ordinance before the Court clearly provides regulations which, in the opinion of the United States Supreme Court, can only be required after the first trimester.

■ 5. The recordkeeping provisions of Section V(a) and (b) deserve special attention since it is the opinion of this Court that they are constitutionally infirm only because they do not provide for the confidentiality of the required records. A similar recordkeeping requirement which provided for confidentiality of the records was up-

held in *Planned Parenthood of Missouri v. Danforth, supra.* In essence, the Court held that recordkeeping can be useful to the State's interest in protecting the health of its female citizens when there is adequate respect for a patient's privacy and confidentiality. No such assurance of a patient's right of privacy is contained in Section V(a) and (b) as those provisions are written.

6. This Court's research of the law in this area has revealed that other ordinances, similar to the one before the Court, have been declared unconstitutional. *E. g., Arnold v. Sendak, supra; Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974); *Word v. Poelker,* 495 F.2d 1349 (8th Cir. 1974). *Friendship Medical Center* is particularly instructive in that case, with minor exceptions, is almost identical to the ordinance before the Court.

■ 7. The Court is further of the opinion that this ordinance is unconstitutional as to first trimester abortions since it violated the Fourteenth Amendment in that it deprives physicians who would perform an abortion of the equal protection of the law. In order for one class to be treated differently from another class where fundamental rights are involved, the burden is on the political subdivision establishing that class to demonstrate a "compelling" reason for treating that class differently from the rest. As the Court has already found, there is no such "compelling" reason for singling out physicians who would give abortions. In addition, the United States Supreme Court has made it evident that there is little justification for singling out the abortion procedure from other medical procedures.

"[N]o other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. *Doe v.*

*Bolton,* 410 U.S. 179, 199, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973)."

■ 8. The ordinance before the Court is also void in many places for vagueness and overbreadth since, as has previously been found by this Court, it fails in many places to clearly define what is required. Physicians who would give abortions are thus subjected to criminal sanctions without giving the physicians adequate notice as to what they must do and what they must not do.

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. . . . Words which are vague and fluid . . . may be as much of a trap for the innocent as the ancient laws of Caligula." *Cramp v. Board of Public Instruction,* 368 U.S. 278, 287, 82 S.Ct. 275, 280, 7 L.Ed.2d 285, 292 (1961).

9. The City has argued that the real issue before the Court is whether a municipality in the State of Alabama has legislative authority to pass an ordinance to prevent what apparently may be malpractice by an itinerant, non-resident doctor. In the first place, the Court does not view the requirements and regulations set forth by the ordinance as being intended to do that which the City argues. In the second place, any physician who performs abortions in Alabama must of necessity be licensed by the State of Alabama or be subject to sanctions. Code of Alabama, Title 46, § 262 (Supp.1973). The State Board of Medical Examiners has the authority to license or not to license out-of-state doctors and is the body which properly considers this question when it decides whether to grant a license to practice in the State of Alabama. In addition, no evidence has been presented to the Court to show that an out-of-state physician, who has been licensed by the State of Alabama, would not follow proper medical procedure in accord with his own best judgment. The City's contention, therefore, is not well taken.

## ORDER

HAND, District Judge.

In accordance with the Findings of Fact and Conclusions of Law entered by this Court in this cause, judgment is hereby rendered in favor of the plaintiffs and against the Board of Commissioners of the City of Mobile in their official capacity, it being the opinion of the Court that the other defendants and the Board of Commissioners of the City of Mobile in their individual capacity ought to be and hereby are dismissed from this action. The ordinance is hereby declared unconstitutional as applied to first trimester abortions except for the provision of Section V(c). The injunctive relief requested by the plaintiffs is hereby denied, the Court being of the opinion that (1) much of that relief has already been accomplished by the Court in this Order, and (2) the requested relief not already accomplished is not appropriate for an injunction at this time. All matters not addressed by this order are MOOT.

Costs in this action are to be taxed against those defendants who have not been dismissed from this action herein. The plaintiffs' request for attorneys fees shall be set for a hearing at such time as the Court deems appropriate.

## APPENDIX A

### AN ORDINANCE TO REGULATE ABORTION SERVICE IN THE CITY OF MOBILE AND PROVIDING PENALTIES FOR THE VIOLATION THEREOF

BE IT ORDAINED BY THE BOARD OF COMMISSIONERS OF THE CITY OF MOBILE that abortions performed within the jurisdiction of the City of Mobile shall comply with the provisions of this Ordinance, and in no other manner or method.

SECTION I. Definitions. When used in these regulations:

(a) Abortion Service means a place or facility in which abortions are performed. There shall be three categories of Abortion Service:

(1) Hospital Abortion Service

(2) Affiliated Abortion Service

(3) Affiliated Physician

(b) Hospital means a hospital as defined in Title 22, Section 204(3), Code of Alabama, 1958, as amended.

(c) Hospital Abortion Service means a licensed Mobile hospital in which abortions are performed.

(d) Affiliated Abortion Service means a place or facility in which abortions are performed not located in a licensed Mobile Hospital and which is located within a total transport time of fifteen (15) minutes from a licensed Mobile hospital with which such service has a written affiliation agreement for the treatment of its patients requiring care on an inpatient basis.

(e) Affiliated Physician means (i) a physician duly licensed to practice medicine and surgery pursuant to Title 46, Section 259, Code of Alabama 1958, as amended, and, (ii) who has written hospital admission privileges, within a total transport time of fifteen (15) minutes, assuring available hospital bed capacity for the proportionately predicted emergency needs of the abortion services performed outside of a hospital or Affiliated Abortion Service, and/or has a comprehensive written contractual agreement with a physician qualified to provide such hospital admission privileges, which agreement will also provide for the requisite professional supervision of patients at all times and in all events where such care is not available by the physician performing the abortion.

(f) Total transport time means the total elapsed time between the diagnosis, at an Affiliated Abortion Service or by an Affiliated Physician, of a complication requiring emergency care and the delivery of the patient and the transfer of responsibility for the patient's care to appropriate medical personnel at a hospital.

(g) Qualified Obstetrician means:

(1) A licensed physician who is a diplomate of the American Board of Obstetrics

and Gynecology; or who submits evidence to the Mobile County Board of Health that his training and experience qualify him for admission to the examination by the American Board of Obstetrics and Gynecology; or

(2) A licensed physician who is a Fellow of the American College of Surgeons in the specialty of Obstetrics and Gynecology.

(3) A Doctor of Osteopathy who holds a license to practice medicine in the State of Alabama and who is certified by the American College of Osteopathic Obstetricians and Gynecologists, or who submits evidence to the Mobile County Board of Health that his training and experience qualify him for admission to the examination by the American College of Osteopathic Obstetricians and Gynecologists, or who submits evidence of completion of an approved residency in obstetrics and gynecology.

(h) Qualified Surgeon means:

(1) A licensed physician who is a diplomat of the American Board of Surgery, or who submits evidence to the Mobile County Board of Health that his training and experience qualify him for admission to the examination by the American Board of Surgery; or

(2) A licensed physician who is a Fellow of the American College of Surgeons; a Doctor of Osteopathy who holds a license to practice Surgery in the State of Alabama and who is certified by the American College of Osteopathic Surgeons, or who submits evidence to the Mobile County Board of Health that his training and experience qualify, him for admission to the examination by the American College of Surgeons or the American College of Osteopathic Surgeons or who submits evidence of completion of an approved residency in surgery.

(i) Registered Professional Nurse means a person who is registered as a registered professional nurse as required by the laws of the State of Alabama.

## SECTION II. Abortions Permitted.

(a) Nothing in this Ordinance shall be construed to prohibit an abortion performed by an Affiliated Physician based upon his best clinical judgment that an abortion is necessary, subject to the provisions of this Ordinance.

(b) No abortion is authorized or shall be performed during the first trimester unless performed in a Hospital Abortion Service, an Affiliated Abortion Service, or by an Affiliated Physician.

(c) No abortion is authorized or shall be performed after the first trimester unless the abortion is performed in a Hospital Abortion Service.

(d) No abortion is authorized or shall be performed after the second trimester unless the physician and two consulting physicians certify that said abortion is necessary in their best clinical judgment to preserve the health or life of the woman. If the product of such abortion is capable of meaningful or sustained life, medical aid then available must be rendered.

## SECTION III. Registration, Requirements and Standards.

(a) No person shall maintain or operate or present himself as maintaining or operating an Abortion Service unless he has first registered such service with the Mobile County Board of Health, and thereafter obtained a license for such service from the City of Mobile. Registration shall be made on forms furnished by the Mobile County Board of Health and shall contain the information required therein. The Board of Health has the right of refusal to register any service that does not comply with the regulations of this Ordinance. Any change in ownership, physician in charge, staff physicians, staff qualifications, extent of operations, location or affiliate hospital shall be reported to the Mobile County Board of Health.

(b) An Abortion Service shall not in any advertisement announcement, letter, circular, poster or sign include any statement expressly or by implication, to the effect that such service is registered with the Mobile County Board of Health or licensed by the City of Mobile or that it or its activities are or have been approved by the Mobile

County Board of Health, or the City of Mobile.

(c) An abortion shall be performed only by a physician licensed to practice in the State of Alabama in an Abortion Service operated in accordance with the provisions of these regulations, or as otherwise herein provided.

SECTION IV.  Filing of Staff and Service Regulations.

An abortion Service shall be maintained in accordance with a set of formal standards which define the professional qualifications of its obstetric, gynecological, surgical, nursing and administrative staff, and which govern the conduct of the service. These standards shall be prepared by the physician in charge of such service and a copy of such standards and any change or modification thereof shall be filed with and approved by the Mobile County Board of Health.

SECTION V.  Records and Reports, Inspection:

(a) Each Abortion Service shall keep records including admission and discharge notes, histories, results of tests and examinations, nurse's work sheets, social service records, and other progress notes of patients, and it shall submit such records when the Mobile County Board of Health shall so require.

(b) Each Abortion Service shall prepare a monthly report which shall be submitted to the Mobile County Board of Health on forms prepared by the Board of Health not later than the 5th day following the end of the month.  Such reports shall include the following:

(1) Number of patients requesting abortions,

(2) Number of patients and age on whom abortions were performed according to the period of gestation and method of termination of pregnancy,

(3) Number of patients for whom abortions were refused and the reasons therefor,

(4) Number of patients referred to other abortion services,

(5) Name and address of patients with a statement of complications following elective abortions describing the nature of the complication.

(c) A statement indicating informed consent in writing and a signed authorization for the performance of an abortion shall be obtained from each patient prior to the procedure.

SECTION VI.  Compliance with Vital Statistics:

Abortion Service shall comply with applicable requirements of the State of Alabama concerning vital statistics.

SECTION VII.  Facilities, Equipment and Supplies Generally.

Facilities, equipment and supplies in an Abortion Service shall be maintained in proper working order.  Necessary solutions, drugs and medications shall be supplied and maintained.  Knee or foot controlled sinks shall be provided in or immediately adjacent to the room where the abortion is performed.  The abortion service facilities and equipment shall be maintained in a clean and sanitary condition.

SECTION VIII.  Transportation Facilities for Affiliated Abortion Service.

An Affiliated Physician and an Affiliated Abortion Service shall have immediately available organized transportation facilities capable of insuring that a patient requiring emergency care at the hospital with which such service is affiliated will be transported to such hospital within the total transport time of fifteen (15) minutes.

SECTION IX.  Elevators.

Any building of more than one story in height and of which an Abortion Service is a part, shall be provided with an elevator suitable for the use of non-ambulatory abortion patients.  The elevator shall be of sufficient size to accommodate a standard stretcher.  When a non-ambulatory abortion patient is moved from one floor to

another, she shall be accompanied by attending medical personnel, or nursing personnel.

## SECTION X. Admission and Examination Facilities.

An Abortion Service shall provide facilities for registration, medical evaluation, examination and referral, and shall be equipped with suitable furnishings and accommodations, including waiting and dressing rooms and other appurtenances for the physical comfort and convenience of patients and personnel. Sufficient suitably equipped examining rooms shall be provided for the daily caseload. Nothing contained herein prohibits registration, interviewing, history-taking, medical examination and appropriate referral from being conducted in an existing prenatal, gynecology and/or family planning clinic.

## SECTION XI. Laboratory Facilities:

(a) A Hospital Abortion Service shall have on its premises a blood bank, a clinical laboratory, and an X-ray laboratory. The clinical laboratory shall be qualified to perform urinalysis, hematocrit and other hematological tests including cross-matching and determinations of blood group and Rh type. The examination of surgically removed tissue, tests for pregnancy, and infrequently performed tests, or those not included within specialties or sub-specialties stated on its permit, or those requiring specialized equipment and skill, may be forwarded to another laboratory approved by the Mobile County Board of Health.

(b) The affiliation agreement of an Affiliated Abortion Service shall include provision for use in the hospital of those facilities required in Subsection XI(a). However, the Affiliated Abortion Service shall have on its premises such facilities as are necessary to perform clinical tests specified in the agreement.

## SECTION XII. Operating Facilities:

(a) A Hospital Abortion Service shall have available on its premises a standard operating room capable of accommodating abdominal as well as vaginal surgical procedures.

(b) For abortions specified in Section XII(a), existing outpatient operating facilities may be utilized or new out-patient operating facilities created, if the policies established by the physician in charge of the Abortion Service and the patient load warrant. If it is found necessary to add to existing outpatient operating facilities, a standard sized treatment room may be converted to an operating facility.

(c) All rooms in which abortions are performed in a Hospital Abortion Service or an Affiliated Abortion Service shall be adequately equipped, supplied and staffed and shall include the following in addition to the instruments and equipment needed for the performance of abortions:

(1) Anesthesia equipment and such other equipment as is necessary to treat patients for hemorrhage, shock, cardiac arrest, and other emergencies.

(2) A Hospital Abortion Service shall have an adequate supply of drugs, compatible whole blood, blood fractions, blood concentrates, plasma expanders and parenteral fluids immediately available at all times with appropriate refrigeration equipment therefor.

(3) An Affiliated Abortion Service shall have an adequate supply of drugs, plasma expanders and parenteral fluids which shall be available at all times with appropriate refrigeration equipment therefor.

(4) Dressing room and scrub-up facilities which are suitably located.

(5) A utility room with facilities for sterilization of supplies, except in an Abortion Service which receives sterile supplies from a central supply service.

(6) A utility room for the cleaning of contaminated materials.

(d) The operating facilities and equipment shall be constructed and maintained so as to be free from sanitary hazards and safety hazards likely to cause a fire or explosion.

(e) Environmental controls to prevent infections, including the control of personnel and patient traffic, shall be maintained in the operating facilities.

SECTION XIII. Recovery Room or Rooms:

An adequately sized and separate recovery room or rooms in proximity to the operating facilities shall be provided. The recovery room shall contain adequate monitoring equipment, suction, oxygen and other related equipment. Such room shall be staffed by qualified nursing personnel. An adequate number of recovery beds and/or rooms shall be provided to insure a minimum of one (1) hour for the recovery of each patient.

SECTION XIV. Staff; Physician in Charge of Abortion Service; Duties:

(a) An Abortion Service shall be staffed so as to provide on the premises adequate medical, nursing, and ancillary personnel.

(b) The Abortion Service shall be supervised by a physician in charge who shall be a qualified obstetrician or, in a service which does not have a qualified obstetrician, by a qualified surgeon.

(c) The physician in charge of the Abortion Service shall be responsible for:

(1) Setting the standards filed with and approved by the Mobile County Board of Health outlining policies and procedures pertaining to abortions and the implementation thereof;

(2) Designating a licensed physician or physicians whom he deems qualified to supervise directly the care of patients undergoing abortion, including their post-operative care and follow-up;

(3) Establishing standards for the observation of patients by nursing personnel during the post-operative period.

(d) A physician shall be present on the premises of the abortion service at all times during the operative and post-operative period.

SECTION XV. Staff; Nursing Supervision of Abortion Patients:

(a) At least one registered professional nurse with post-graduate education or experience in obstetric or gynecological nursing shall supervise and direct the nursing personnel and care and shall be on duty in an abortion service at all times while in use.

(b) Student nurses, practical nurses, attendants and other ancillary personnel assigned to give nursing care in an Abortion Service shall be adequately trained in observation and emergency techniques for pre-operative and post-operative care of abortion patients and shall be under the direct personal supervision of a registered professional nurse at all times.

SECTION XVI. Staff; Social Service.

An Abortion Service should have a social service unit available to serve its patients adequately.

SECTION XVII. Admission and Examination Procedures:

(a) Every woman seeking to terminate her pregnancy shall be registered as expeditiously as possible and, whenever possible, on the same day of registration shall be seen by a physician and staff for history taking, physical examination and necessary laboratory tests.

(b) The diagnosis of pregnancy shall be the responsibility of the examining physician.

(c) A complete medical history shall be obtained and the physical examination shall be complete and not confined solely to a pelvic examination. The following laboratory tests shall be performed on every patient: hematocrit, Rh factor, complete urinalysis, blood grouping by the blood bank in the event a cross-matching test for transfusion is required.

(d) Where medical evaluation, examination and referral are made from a private physician's office, hospital, clinic or other Abortion Service, pertinent records thereof shall be made available at the time the

patient is registered and admitted to the Abortion Service. Proper policies and procedures for coordination or referral from various sources shall be established by the physician in charge of the Abortion Service and adhered to by all members of the staff.

(e) There shall be an interval of not less than twenty-four (24) hours between initial examination and termination of pregnancy to permit the reporting to and review of all laboratory tests by the examining physician and to permit and encourage thorough consideration and a firm decision by the patient regarding termination of pregnancy, if possible. No patient shall be coerced in any manner by the staff of the Abortion Service in arriving at her decision.

SECTION XVIII. Rh Sensitization Prophylaxis:

Each Abortion Service shall provide Rh factor sensitization prophylaxis to all Rh negative patients according to standard medical procedures.

SECTION XIX. Operative and Post-Operative Requirements:

(a) Abortions on patients with a gestation up to and including twelve weeks as determined by the physician may be performed on an ambulatory basis in an abortion service if the patient's medical condition permits.

(b) The following patients shall be treated only on an inpatient basis for the abortion:

(1) Patients pregnant more than twelve weeks as determined by the physician,

(2) Patients having such medical, surgical, gynecological or psychiatric conditions or complications as specified in the rules of the chief of staff of the Abortion Service and filed with and approved by the Mobile County Board of Health.

(c) Only physicians shall be permitted to perform abortions. Termination of pregnancies involving more than twenty-four (24) weeks gestation shall not be performed by the physician without appropriate medical consultation.

(d) Where general or local anesthesia is administered to abortion patients it shall be administered by personnel qualified by education and training.

(e) Pathologic examination of all tissue removed from the uterus shall be performed routinely.

(f) Patients shall receive the following post-operative care:

(1) Patients whose pregnancy was terminated on an ambulatory basis shall be observed in the Abortion Service for a reasonable period of one hour to ensure that no immediate post-operative complications are present.

(2) Patients of an Affiliated Physician or in an Affiliated Abortion Service in whom any adverse condition exists or in whom a complication is known or suspected to have occurred during or after the performance of the abortion shall be transferred and admitted to a back-up hospital.

(g) Written instructions filed with, and approved by the Mobile County Board of Health shall be issued to all patients in accordance with the rules of the physician in charge of the Abortion Service and shall include the following:

(1) Symptoms of complications to be looked for,

(2) Activities to be avoided,

(3) Specific telephone number to be used by the patient should any complication occur or question arise,

(4) Date for follow-up or return visit after the performance of the abortion which shall be scheduled within two or six weeks as indicated by the condition of the patient,

(5) Information on availability of family planning services when desired by the patient. When, in the opinion of the physician it is in the best interests of the patient, family planning services may be initiated, with the consent of the patient, prior to leaving the Abortion Service.

SECTION XX.  Separability.

If any section or provision of this ordinance shall be held invalid, such holding shall not invalidate any other section or provision of this ordinance which is not of itself invalid.

SECTION XXI.  Penalty.

Any person found guilty of violating the provisions of this Ordinance shall be punished as provided in Section 1–4 of the Mobile City Code, 1965.

Adopted:  July 6, 1976.