681 F.Supp. 1385 (1988)
WOMEN'S HEALTH CENTER OF WEST COUNTY, INC., et al., Plaintiffs,
v.
William L. WEBSTER, et al., Defendants.
No. 87-0050C(6).
United States District Court, E.D. Missouri, E.D.
March 21, 1988.
*1386 Irving L. "Buddy" Cooper, Karen A. Greenberg, Edwards, Cooper & Singer, St. Louis, Mo., for plaintiffs.
Jerry L. Short, Asst. Atty. Gen., Jefferson City, Mo., for defendants Webster & State of Mo.
Lawrence E. Mooney, Pros. Attorney's Office, St. Louis, Mo., for defendant Westfall.

MEMORANDUM OPINION
GUNN, District Judge.
Plaintiffs bring the present action for declaratory and injunctive relief in which they challenge the constitutionality of Section 188.080, R.S.Mo. (1986). Section 188.080 provides in pertinent part that a physician who performs an abortion and who does not have surgical privileges at a hospital which offers obstetrical or gynecological care is guilty of a class B felony. Plaintiffs contend that Section 188.080 impermissibly burdens a woman's right to privacy guaranteed under the first, fourth, fifth, ninth and fourteenth amendments of the United States Constitution, denies them their due process and equal protection rights guaranteed under the fourteenth amendment of the United States Constitution, and is unconstitutionally vague.
*1387 A hearing on the issues was held by the Court. Based on the pleadings, evidence and the law presented to it, the Court now declares Section 188.080 constitutional and enters judgment in favor of defendants and against plaintiffs.
The Court makes the following findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

FINDINGS OF FACT
Plaintiffs Women's Health Center of West County, Inc., Women's Health Center of Cape Girardeau, Inc. and Women's Health Center of St. Peters, Inc. (collectively "Women's Health Centers") are Missouri corporations in good standing with their principal places of business in St. Louis County, Cape Girardeau and St. Peters. The centers offer gynecological medical services to the public, including first and second trimester abortions. Plaintiff Bolivar M. Escobedo, M.D. ("Escobedo"), a resident of St. Louis County, is president of the Women's Health Centers and is licensed to practice medicine in the State of Missouri. He specializes in obstetrical and gynecological care, including abortions. Plaintiff C.J.E., also a resident of St. Louis County, was, at the time of filing suit, a twenty-two year old unmarried pregnant woman who wanted to obtain an abortion.
Defendants are the State of Missouri, William L. Webster, the state's Attorney General, and George "Buzz" R. Westfall, the Prosecuting Attorney for St. Louis County, Missouri. Defendants Webster and Westfall are charged with the duty of enforcing the laws of Missouri, including Section 188.080. Defendant Westfall has threatened to criminally prosecute Escobedo if he performs an abortion without obtaining surgical privileges at a hospital which offers obstetrical or gynecological care.
Section 188.080 was passed by the Missouri General Assembly on April 23, 1986, signed into law by Governor John Ashcroft on June 26, 1986, and became effective on August 13, 1986. It provides:
Notwithstanding any other penalty provision in this chapter, any person who is not a licensed physician as defined in section 188.015 who performs or attempts to perform an abortion on another as defined in subdivision (1) of section 188.015, is guilty of a class B felony, and, upon conviction, shall be punished as provided by law. Any physician performing an abortion who does not have surgical privileges at a hospital which offers obstetrical or gynecological care shall be guilty of a class B felony, and, upon conviction, shall be punished as provided by law.
Plaintiffs' only challenge is to the constitutionality of the second sentence of Section 188.080, which requires physicians who perform abortions to have surgical privileges at a hospital that offers obstetrical or gynecological care.
Escobedo, who is forty-nine years old, was born in Lima, Peru and became a naturalized United States citizen in March of 1985. He was educated in Lima's San Marcos University, where he received his medical degree. Shortly thereafter, he came to the United States and did his general internship at Meadowbrook Hospital in New York. He completed his first year of residency at Pontiac General Hospital in Pontiac, Michigan, and his second and third years of residency at St. Louis University in St. Louis, Missouri, where he specialized in obstetrics and gynecology. He has been licensed to practice medicine in the state of Missouri since 1972.
Escobedo presently maintains staff and surgical privileges at two hospitals in Lima, Peru. He has, in the past, had temporary staff and surgical privileges at the following hospitals in Missouri: St. Louis City Hospital, St. Mary's Hospital, Firmin-Desloge Hospital and DePaul Community Hospital. He was previously on staff at DePaul Community Hospital, Lindell Hospital and Midwest General Hospital, where he also maintained surgical privileges as an obstetrician-gynecologist. He voluntarily resigned from his staff positions at DePaul Community Hospital and Lindell Hospital. Midwest General Hospital has subsequently been sold and has closed its surgical unit.
*1388 As a result of the enactment of Section 188.080, Escobedo has recently submitted applications for staff and surgical privileges at the following hospitals in Missouri: Barnes Hospital, Jewish Hospital, St. John's Mercy Medical Center, Missouri Baptist Hospital, Firmin-Desloge Hospital, Wentzville Community Hospital and Lindell Hospital. Wentzville Community Hospital and Lindell Hospital have rejected his applications, and those at the other hospitals are pending.
Escobedo is the only physician licensed to practice medicine in the state of Missouri who wants to perform abortions and who has yet to obtain surgical privileges at a hospital offering obstetrical or gynecological care. Since filing the present action in January of 1987, he has refrained from performing abortions by reason of Section 188.080. Although he continues to provide other gynecological services, he refers prospective patients who want to obtain abortions to other physicians, including those on staff at each of the Women's Health Centers who do have hospital surgical privileges. There is no evidence that any prospective patient has been deterred from obtaining an abortion or turned away for any reason.
Escobedo is not lacking in experience. In the fourteen years immediately preceeding the filing of this action, he performed over 50,000 abortions. Prior to each abortion, he requires the patient to review with him and to sign an "Operative Permit, Abortion Permit, or Consent for Surgery" ("Operative Permit"). In the Operative Permit, he informs the patient that an abortion is "a surgical procedure" which "carries its own risks." These risks include such complications as "anesthetic reaction, hemorrhage, infection [and] uterine perforation." In the event there is a complication, he informs the patient that hospitalization may be necessary and requires them to consent to the payment of all hospital charges.
Escobedo estimates that of the 50,000 abortions he has performed, only ten resulted in complications that required hospitalization. However, the Court finds such an estimate to be an unreliable indicator of the percentage of abortions which result in serious complications. Escobedo admits that over sixty percent of his abortion patients live between one hundred and two hundred miles from St. Louis County and that he could not be certain whether any of these patients experienced complications.
C.J.E. is employed by Women's Health Center of West County, Inc., as a medical assistant and counselor. Although she has received some nurse's training, she is not a registered nurse. Nevertheless, as an employee of Women's Health Center of West County, Inc., she assists physicians who perform abortions in both the operating room and the recovery room. She also counsels patients who obtain an abortion and instructs them on how to take their medication.[1]
At the time of filing this action, C.J.E. was approximately in her sixth week of pregnancy and wanted to obtain an abortion from Escobedo. Escobedo informed her that he was unable to perform an abortion as he had failed to obtain surgical privileges at a hospital. Shortly thereafter, C.J.E.'s pregnancy was terminated by a spontaneous abortion or miscarriage. C.J.E. testified that, having had three prior abortions at the hands of Escobedo, she was unsure whether she would have an abortion from any other physician. The Court, having observed C.J.E.'s demeanor at trial and having taken into account her familiarity with the abortion procedure, does not find her testimony to be credible and finds that she would not have been deterred from obtaining an abortion. She is fully aware of the abundance of competent abortion service available to her at the Women's Health Centers, including the one at which she works.
Based on the testimony of John Anstey, M.D., a legislative representative of the American College of Obstetricians and Gynecologists and board certified in obstetrics and gynecology, and Matthias H. Backer, *1389 Jr., M.D., chairman of the Department of Obstetrics and Gynecology at St. Louis University and also board certified in obstetrics and gynecology, the Court finds that an abortion performed in the first or second trimester of pregnancy may give rise to the following complications which necessitate prompt hospital care: adverse anesthetic reactions, unexplained shock, infection, hemorrhaging, cervical lacerations and perforation of the uterus. These complications arise in approximately 0.3% to 0.4% of all first and second trimester abortions.
As indicated by the testimony of doctors Anstey and Backer, it is the accepted medical practice in Missouri for a physician who performs first or second trimester abortions to have surgical privileges at a hospital which provides obstetrical or gynecological care. The purpose of the practice is two-fold. First, it ensures that the physician will have the authority to admit a patient in a hospital whose facilities and resources are familiar to him. Second, it ensures that the patient will have immediate access to secondary or tertiary care. It is also the accepted custom in Missouri for hospitals to provide emergency care even if the patient's physician is without surgical privileges at the hospital. However, it is not accepted medical practice for a physician who performs first or second trimester abortions to rely exclusively on such a custom. If the physician does, a patient may be denied the care of the treating physician who is most familiar with her condition. The patient may also fail to receive the same level of diagnostic acumen as she would from her treating physician if the physicians on duty in the emergency room, or even the physicians on call at the hospital, do not have the same expertise in obstetrics or gynecology.
The Standards for Obstetrics and Gynecological Services, Sixth Edition, promulgated by the American College of Obstetrics and Gynecologists, are substantially similar to the accepted medical practice in Missouri and provide in pertinent part as follows:
Ambulatory care facilities for abortion services should meet the same standards of care as for other surgical procedures. Physicians performing abortions in their offices should provide for prompt emergency treatment or hospitalization in the event of complication. Clincis and free-standing ambulatory care facilities should have written agreements with nearby hospitals for the transfer of patients requiring treatment for emergency complications in abortion procedures.
These standards, moreover, are virtually identical to the statutorily-required standards for all outpatient surgical procedures in Missouri. Under Missouri's Ambulatory Surgical Center Licensing Law, § 197.200, et seq., R.S.Mo. (1986), outpatient clinics providing surgical procedures, including surgical procedures for the purpose of performing childbirths, may only be licensed if the person performing the surgery either has surgical privileges in at least one licensed hospital or has entered into a written agreement with at least one licensed hospital guaranteeing the transfer and admittance of patients for emergency treatment. See § 197.215.1(2), R.S.Mo. (1986).

CONCLUSIONS OF LAW
The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The Court is authorized to grant declaratory judgment relief pursuant to 28 U.S.C. §§ 2201 and 2202.

Right to Privacy
Plaintiffs' contention that Section 188.080 impermissibly burdens a woman's right to privacy must be considered within the analytical framework set forth by the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny.
In Roe, the Supreme Court recognized that the "right of privacy, ... founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action ..., is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Roe, 410 U.S. at 153, 93 S.Ct. at 727. The right, however, though fundamental, is not absolute, and *1390 may be subject to regulations designed to further important state interests in "safeguarding health, ... maintaining medical standards, and ... protecting potential life." Roe, 410 U.S. at 154, 93 S.Ct. at 727. Nevertheless, and as is the case when any fundamental right is implicated, such regulations must be justified by a "compelling state interest" and "narrowly drawn to express only the legitimate state interests at stake." Roe, 410 U.S. at 155, 93 S.Ct. at 728.
Under Roe, the relationship between a woman's privacy right and the state's interest in regulating the exercise of that right varies with the stages of the pregnancy. Prior to approximately the end of the first trimester, and due to the fact that mortality rates in women undergoing abortions at such time are as low as or lower than mortality rates in women experiencing normal childbirth, the state's interest in safeguarding the health of the mother is insufficiently "compelling" and "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." Roe, 410 U.S. at 163-64, 93 S.Ct. at 732. At approximately the end of the first trimester, however, the state's interest in safeguarding the health of the mother becomes "compelling" and the state "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." Roe, 410 U.S. at 163, 93 S.Ct. at 731-32. Such regulations include requirements as to the qualifications of the person who is to perform the abortion, the licensure of that person, the facility in which the procedure is to be performed, the licensing of that facility, and other similar matters. Roe, 410 U.S. at 163, 93 S.Ct. at 732. At the point at which the fetus becomes "viable" the state's interest in preserving potential life becomes "compelling," and the state may regulate, indeed proscribe, the abortion procedure, "except where it is necessary ... for the preservation of the life or health of the mother." Roe, 410 U.S. at 164-65, 93 S.Ct. at 732.[2] The analysis in Roe continues to be affirmed in recent Court opinions. See City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed. 2d 687 (1983); Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed. 2d 779 (1986).
The apparent effect of the Roe decision is to assure that abortions performed during the first trimester, when neither the state's interest in safeguarding the health of the mother nor the state's interest in preserving potential life is compelling, are virtually free from substantial state regulation. Nevertheless, and as the Court subsequently made clear in Connecticut v. Menillo, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed. 2d 152 (1975), the Roe analysis, particularly its evaluation of the state's interest in safeguarding the health of the mother, is predicated on the assumption that the abortion procedure "is performed by medically competent personnel under conditions insuring maximum safety for the woman." (citation omitted). Menillo, 423 U.S. at 11, 96 S.Ct. at 171. Thus, in Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court upheld regulations, applicable to first trimester abortions, which required a woman to provide her informed written consent to the abortion and required a physician to keep certain records as these regulations were shown to promote important health-related state concerns. Danforth, 428 U.S. at 65-67, 96 S.Ct. at 2839-40. As the Court explained in Akron, supra, for such regulations to pass constitutional muster they must meet two requirements: they must have "no significant impact" on a woman's right to an abortion and they must be justified by an "important state health objective." Akron, 462 U.S. at 430, 103 S.Ct. at 2492. Even then, however, these regulations must be shown not to interfere with the "physician-patient consultation" *1391 or with "the woman's choice between abortion and childbirth." Akron, 462 U.S. at 430, 103 S.Ct. at 2493.
Given the mandate of Roe and its progeny, the Court may only uphold Section 188.080, which applies alike to first and second trimester abortions, if it finds that it has "no significant impact" on a woman's right to an abortion, defined in Roe to include both the abortion decision and its effectuation, and that it is justified by an "important state health objective." The Court, based on its findings of fact, has no hesitation in concluding that Section 188.080 meets each of these requirements.
First, Section 188.080 has, at most, only a de minimus effect on a woman's right to an abortion. Escobedo is the only physician in Missouri who wishes to perform abortions and who has yet to obtain surgical privileges at a hospital offering obstetrical or gynecological care. Although prospective patients have come to him for the purpose of obtaining an abortion, he has referred them to other physicians possessing the requisite surgical privileges, including those on staff at each of the Women's Health Centers. There is simply no evidence that any woman seeking an abortion has been or will be hindered from obtaining an abortion by reason of the enactment of Section 188.080. Moreover, as the Court in Danforth observed, the decision to abort is "an important, and often a stressful one." Danforth, 428 U.S. at 66-67, 96 S.Ct. at 2840. Section 188.080, by assuring that all abortions will be performed by a physician with surgical privileges at a hospital, may indeed alleviate, rather than impede, a woman's decision to obtain an abortion, as it will ensure that the abortion will be accomplished "under conditions insuring maximum safety for the woman." Menillo, 423 U.S. at 11, 96 S.Ct. at 171.
Second, Section 188.080 is justified by an "important state health objective." In first and second trimester abortions, complications such as adverse anesthetic reactions, unexplained shock, infection, hemorrhaging, and perforation of the uterus do occur and necessitate immediate hospitalization. By enacting Section 188.080, the state not only ensures that a physician will have the authority to admit his patient into a hospital whose resources and facilities are familiar to him, but also ensures that the patient will gain immediate access to secondary or tertiary care.
Section 188.080, when fairly read against the regulations governing all outpatient surgical procedures in the state, does not unduly single out the abortion provider. Under Missouri's Ambulatory Surgical Center Licensing Law, § 197.200, et seq., R.S.Mo. (1986), outpatient clinics providing surgical procedures, including surgical procedures for the purpose of performing childbirths, may only be licensed if the physician performing the surgery has surgical privileges in at least one licensed hospital or, in the alternative, has entered into a written agreement with at least one licensed hospital guaranteeing the transfer and admittance of patients for emergency treatment. See § 197.215.1(2), R.S.Mo. (1986). Given the frequently stressful conditions under which an abortion is performed, the distinctions between Section 188.080 and the regulations enbodied in Chapter 197, R.S.Mo. (1986), are distinctions in degree, not in kind, and do not, by themselves, render Section 188.080 unconstitutional. See Danforth, 428 U.S. at 66-67, 96 S.Ct. at 2840 (upholding written consent requirement for abortions even though there are no written consent requirements for most other surgical procedures). Finally, the Court notes that Section 188.080 is consistent with the standards promulgated by the American College of Obstetricians and Gynecologists insofar as both require that physicians who perform abortions make arrangements for prompt emergency treatment or hospitalization in the event of a complication.
Plaintiffs attempt to avoid the result reached here by referring the Court to three district court opinions dealing with similar regulations. See Hallmark Clinic v. North Carolina Department of Human Resources, 380 F.Supp. 1153 (E.D.N.C. 1974); Mobile Women's Medical Clinic v. Board of Commissioners, 426 F.Supp. 331 (S.D.Ala.1977); Women's Medical Center of Providence, Inc. v. Cannon, 463 F.Supp. *1392 531 (D.R.I.1978). However, these cases may easily be distinguished. In each case, the courts abrogated regulations requiring physicians who perform abortions, including first trimester abortions, to obtain surgical privileges at a hospital and/or written or oral agreements with hospitals for the emergency transfer and admission of patients to a hospital. In Hallmark Clinic and Women's Medical Center of Providence, the regulations were annulled, at least in part, as they isolated abortion for special treatment. Hallmark Clinic, 380 F.Supp. at 1158; Women's Medical Center of Providence, 463 F.Supp. at 535. In Mobile Women's Medical Clinic, decided prior to Akron, the regulation was nullified by the Court's holding that any regulation of a first trimester abortion was prohibited by Roe. Mobile Women's Medical Clinic, 426 F.Supp. at 335. As Akron makes clear, such an interpretation of Roe is erroneous.
In sum, under the challenge in this case, the Court holds that Section 188.080 has "no significant impact" on a woman's right to an abortion and is justified by an "important state health objective." It does not violate a woman's right to privacy within the meaning of Roe.

Due Process
Plaintiffs' contention that Section 188.080 violates their due process rights guaranteed under the fourteenth amendment rests upon the assumption that the state is impermissibly delegating to a hospital the power to regulate abortions. Such delegation of power, plaintiffs contend, by vesting a hospital with the authority to determine who can obtain surgical procedures and thus who can perform an abortion, constitutes government by caprice and cannot withstand fourteenth amendment challenge. The underlying merit of plaintiffs' argument depends upon a hospital's discretion to grant or deny surgical privileges.
It is well established that a licensed physician "`has no constitutional right to practice medicine in a public hospital.'" Klinge v. Lutheran Charities Association of St. Louis, 523 F.2d 56, 61 (8th Cir.1975), quoting Woodbury v. McKinnon, 447 F.2d 839, 842-43 (5th Cir.1971). However, it is likewise well established that a public hospital's decision to grant or deny a licensed physician staff or surgical privileges constitutes state action and as such is subject to the restraints of the fourteenth amendment's due process clause. Id. Thus, a public hospital may not deny a licensed physician staff or surgical privileges on the basis of rules or acts which are unreasonable, arbitrary, capricious or discriminatory. See Annot. 37 A.L.E.3d 645 (1971) (and cases cited therein). See also Klinge, 523 F.2d at 61 (a court should not interfere with a public hospital's staff selections so long as they are administered with fairness, geared by a rationale compatible with hospital responsibilities and unencumbered with irrelevant considerations).[3]
Public hospitals in Missouri are governed by the Missouri Hospital Licensing Law, Chapter 197, R.S.Mo. (1986), and Regulations and Codes promulgated by the Missouri Division of Health. Under applicable Missouri Division of Health regulations, hospitals are required to follow neutral criteria in determining whether to grant surgical privileges. Specifically, their decisions must be "based on a [licensed physician's] education, performance, training, competence and such uniform requirements that may be established by the governing body [of the hospital]. 13 C.S.R. 50-20.021(2)(c). As opposed to a sanction of *1393 whimsical actions by hospitals, these regulations circumscribe a public hospital's discretion to grant or deny surgical privileges. Plaintiffs' fear of indiscriminate actions resulting from the enactment of Section 188.080 are flawed.
If, however, such a result does occur, appropriate redress is available through the courts.
Although the Supreme Court has not directly addressed the delegation issue in the abortion context, it has impliedly approved that evidenced in Section 188.080. The Roe analysis is predicated upon the assumption that the abortion procedure "is performed by medically competent personnel under conditions insuring maximum safety for the woman" (citation omitted). Menillo, 423 U.S. at 11, 96 S.Ct. at 171. Roe notes that a state can proscribe any abortion performed by a physician who is not currently licensed to practice medicine in that state. Roe, 410 U.S. at 165, 93 S.Ct. at 732-33. The delegation of authority to a state licensing board to license a physician is different only in degree, not kind, to the designation of authority to a public hospital to grant surgical privileges.
Accordingly, the Court finds that Section 188.080 does not constitute an unlawful ordination of power within the meaning of the fourteenth amendment.

Equal Protection
Plaintiffs contend that Section 188.080 violates Escobedo's equal protection rights guaranteed under the fourteenth amendment as it places more stringent requirements on the performance of abortions than are placed on other similar or more serious surgical procedures. In assessing the merits of plaintiffs' contention, the Court must first determine the appropriate standard of review and in the light of this standard evaluate the distinctions between Section 188.080 and other regulations governing surgical procedures in the state.
As Escobedo is here advancing his own equal protection rights, and not the due process rights of his patients, the distinctions between Section 188.080 and regulations governing other surgical privileges neither involves a suspect class nor implicates any fundamental rights. Birth Control Centers, Inc. v. Reizen 743 F.2d 352, 358 (6th Cir.1984). Accordingly, the appropriate standard of review is the rational basis standard. Id. Under such a standard, the courts "presume the constitutionality of the statutory discrimination and require only that the classification challenged be rationally related to a legitimate state interest." City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). The distinctions must be "reasonable, not arbitrary, and rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U.S. 71, 75-76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561-62, 64 L.Ed. 989 (1920).
As the Court has previously noted, Section 188.080 does not unduly segregate the abortion provider. Outpatient clinics providing surgical procedures, including those involving childbirth, may only be licensed if the physician performing the surgery has surgical privileges in at least one licensed hospital or, in the alternative, has entered into a written agreement with at least one licensed hospital guaranteeing the transfer and admittance of patients for emergency treatment. See § 197.215.1(2), R.S.Mo. (1986). Section 197.215.1(2) is slightly less stringent than Section 188.080. But the differences between the sections, given the complications which may arise from the abortion procedure and the frequently stressful conditions under which it is performed, do not render Section 188.080 unreasonable or arbitrary. See Danforth, 428 U.S. at 66-67, 96 S.Ct. at 2840 (upholding written consent requirement for abortions even though there are no written consent requirements for most other surgical procedures). Indeed, the Court has already found Section 188.080 to be justified by an "important state health objective."
The Eighth Circuit has held that "[w]here the state regulates abortion beyond its regulation of similar surgical procedures, the differences in treatment must *1394 be shown to be necessitated by the particular characteristics of the abortion procedure." (citations omitted). Hodgson v. Lawson, 542 F.2d 1350, 1358 (8th Cir.1976). Defendants have made such a showing. Accordingly, the Court finds that Section 188.080 does not violate Escobedo's equal protection rights.

Vagueness
Plaintiffs contend that Section 188.080 is unconstitutionally vague insofar as it fails to specify the location of a hospital where a physician who wishes to perform an abortion must obtain surgical privileges. As Escobedo maintains surgical privileges at two hospitals in Lima, Peru, but has no surgical privileges at a hospital in Missouri, he contends that he cannot know whether he has conformed to its requirements and thus whether he is prohibited from performing abortions.
The Supreme Court in Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), set forth the appropriate standard for evaluating the alleged vagueness of a criminal abortion statute such as Section 188.080:
It is settled that, as a matter of due process, a criminal statute that "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute," United States v. Harriss, 347 U.S. 612, 617 [74 S.Ct. 808, 812, 98 L.Ed. 989] (1954), or is so indefinite that it "encourages arbitrary and erratic arrests and convictions," Papachristou v. Jacksonville, 405 U.S. 156, 167 [92 S.Ct. 839, 846, 31 L.Ed.2d 110] (1972), is void for vagueness.
Colautti, 439 U.S. at 390, 99 S.Ct. at 683. Moreover, federal courts should construe a statute so as to avoid unconstitutionality whenever such a construction is fair. Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft, 462 U.S. 476, 493, 494 n. 21, 103 S.Ct. 2517, 2526, 2527 n. 21, 76 L.Ed.2d 733 (1983); Akron, 462 U.S. at 441, 103 S.Ct. at 2498.
It takes an unreasonable stretch of the imagination to construe Section 188.080 so as to authorize a physician to perform an abortion if he maintains surgical privileges at a hospital outside of Missouri. The test of statutory construction is one of sense and reason. Premachandra v. Mitts, 727 F.2d 717, 727 (8th Cir.1984), on rehearing, 753 F.2d 635 (8th Cir.1985) (en banc). The Court finds that Section 188.080 is fairly susceptible to only one construction: physicians who perform abortions must maintain surgical privileges at a hospital in Missouri. A physician "of ordinary intelligence" would construe it in such a manner and would therefore have "fair notice" that he must maintain surgical privileges at a hospital in Missouri if he is to perform abortions within the state.
The Court therefore finds that Section 188.080 is not unconstitutionally vague within the meaning of Colautti.

ORDER AND JUDGMENT
Pursuant to the memorandum opinion filed herein on this date,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment in this action be entered in favor of defendants and against plaintiffs. The Court further declares Section 188.080, R.S.Mo. (1986), to be constitutional. Plaintiffs' request for injunctive relief is accordingly denied.
NOTES
[1] C.J.E. testified that various prescription medicines are readily available at the clinic and that she has occasionally helped herself to these medications for her personal needs.
[2] Although the Court in Roe did not directly address the state's interest in maintaining medical standards, it did note that a state may proscribe any abortion performed by a physician who is not currently licensed to practice medicine in that state. Roe, 410 U.S. at 165, 93 S.Ct. at 732-33.
[3] A private hospital is not subject to the same restraints and the courts will not interfere with its decision to grant or deny surgical privileges. See, e.g., Richardson v. St. John's Mercy Hospital, 674 S.W.2d 200 (Mo.App.1984). However, as plaintiffs have presented no evidence to demonstrate that a physician could not comply with the requirements of Section 188.080 by obtaining surgical privileges at a public hospital, the Court finds that a private hospital's discretion to grant or deny surgical privileges is irrelevant. It is, moreover, for this reason that the Court finds Hallmark Clinic v. North Carolina Department of Human Resources, 380 F.Supp. 1153 (E.D.N.C.1974), the case upon which plaintiffs rely, inapposite. In Hallmark Clinic, the court struck down a regulation similar to Section 188.080 on the premise that a "state cannot confer upon a private institution" the power to deny a physician surgical privileges and thus prevent a woman from obtaining an abortion. Id. at 1158-59 (emphasis supplied).